# 23-944

# United States Court of Appeals
# For the Second Circuit

LINK MOTION INC.,

*Plaintiff–Appellant*,

*v.*

DLA PIPER LLP (US); CARYN G. SCHECHTMAN,

*Defendants–Appellees*.

On Appeal from the U.S. District Court for the Southern District of New York
No. 22-cv-8313 (Hon. Victor Marrero)

## BRIEF FOR DEFENDANTS–APPELLEES

Nancy E. Hart
Peter M. Wade
William J. Moccia
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166

Katherine Moran Meeks
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Washington, DC 20036

Kevin S. Rosen
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
krosen@gibsondunn.com

*Counsel for Defendants–Appellees*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee DLA Piper LLP (US) states that it is a Maryland limited liability partnership that practices law in various jurisdictions. It has no corporate parent, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................... 1

JURISDICTIONAL STATEMENT ................................................ 6

STATEMENT OF ISSUES ............................................................ 7

STATEMENT OF THE CASE........................................................ 7

I.    Factual Background.............................................................. 7

    A.    DLA Undertook a Limited Engagement for Link Motion. ................. 7

    B.    Link Motion Declined to Retain DLA in the *Baliga* Action. .............. 8

    C.    Shi Retained Counsel and Attacked the Receivership...................... 11

    D.    Link Motion Filed a Malpractice Claim Rehashing Arguments Already Rejected in the Related Cases............................................. 11

II.   Procedural History.............................................................. 14

    A.    Link Motion's Unsuccessful Motion to Remand............................. 14

    B.    The District Court Dismisses the Malpractice Action. ..................... 17

    C.    The Magistrate Judge Recommends Sanctioning Counsel in the *China AI* Action for Filing a Frivolous Complaint With Demonstrably False Allegations......................................................... 17

SUMMARY OF ARGUMENT .......................................................... 18

STANDARD OF REVIEW ............................................................... 22

ARGUMENT................................................................................. 23

I.    Removal Was Proper Because the District Court Had Federal "Arising Under" Jurisdiction Over the Action. ......................................... 23

    A.    It Is Undisputed That Link Motion's Malpractice Claim "Necessarily Raises" Federal Issues That Are "Actually Disputed."........................................................................... 23

B.    The District Court Correctly Held That the Federal Issues Here
      Are "Substantial." ................................................................... 24

C.    The District Court's Exercise of Federal Jurisdiction Over the
      Malpractice Action Does Not Disrupt the Federal-State
      Balance. ................................................................................... 34

II.   Removal Was Also Proper Because the District Court Had
      Supplemental Jurisdiction. ............................................................... 37

III.  The Malpractice Claim Is Time-Barred. ........................................... 39

A.    Link Motion's Claim Accrued on January 21, 2019 and Expired
      on January 21, 2022 ............................................................... 39

B.    The "Continuous Representation" Doctrine Does Not Toll the
      Limitations Period. ................................................................. 40

C.    Executive Order 202.8 Would Not Apply Even If Link Motion
      Correctly Calculated the Date Its Claim Accrued. ............... 43

D.    Equitable Tolling Does Not Salvage Link Motion's Time-
      Barred Claim. .......................................................................... 49

IV.   The Court May Affirm Dismissal of the Complaint on the Alternative
      Ground that Link Motion Has Failed to Plead Causation. ............... 53

A.    Link Motion Cannot Show the District Court Would Have
      Declined to Appoint the Receiver "But For" DLA's Alleged
      Conduct. .................................................................................. 54

B.    Numerous Intervening Causes Separate DLA's Alleged
      Conduct from Link Motion's Alleged Harm. ........................ 55

CONCLUSION .................................................................................................. 59

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aaron v. Roemer, Wallens & Mineaux, LLP,*
707 N.Y.S.2d 711 (App. Div. 2000)....................................................40

*Abbas v. Dixon,*
480 F.3d 636 (2d Cir. 2007) ...............................................................50

*Achtman v. Kirby, McInerney & Squire, LLP,*
464 F.3d 328 (2d Cir. 2006) ...........................................19, 37, 38, 50

*Adirondack Cap. Mgmt. v. Ruberti, Girvin & Ferlazzo, P.C.,*
842 N.Y.S.2d 603 (App. Div. 2007)....................................................58

*Allianz Ins. Co. v. Lerner,*
416 F.3d 109 (2d Cir. 2005) ...............................................................55

*Anderson v. Greene,*
2016 WL 4367960 (S.D.N.Y. Aug. 10, 2016)...............................40, 41

*Armstrong v. McAlpin,*
699 F.2d 79 (2d Cir. 1983) .................................................................51

*Backer v. Cooperatieve Rabobank U.A.,*
338 F. Supp. 3d 222 (S.D.N.Y. 2018).................................................34

*Baker v. 40 Wall St. Holdings Corp.,*
161 N.Y.S.3d 723 (Sup. Ct. 2022)...........................................21, 46, 47

*Baliga v. Link Motion, Inc.,*
2022 WL 16707361 (S.D.N.Y. Nov. 4, 2022)......................................55

*Baliga v. Link Motion Inc.,*
2022 WL 2531535 (S.D.N.Y. Mar. 9, 2022) ...................12, 29, 32, 54

*Baliga v. Link Motion Inc.,*
2022 WL 3363787 (S.D.N.Y. Aug. 10, 2022)......................................55

*Baliga v. Link Motion Inc.,*
2022 WL 3699339 (S.D.N.Y. Aug. 25, 2022)................3, 12, 25, 29, 32, 33, 54

*Baliga v. Link Motion, Inc.*,
    2022 WL 6091994 (S.D.N.Y. Oct. 7, 2022) .......................................................14

*Baliga v. Link Motion Inc.*,
    385 F. Supp. 3d 212 (S.D.N.Y. 2019).........................................................11, 55

*Barry v. Royal Air Maroc*,
    2022 WL 3215050 (S.D.N.Y. July 8, 2020) ...............................................46

*BMO Harris Bank, N.A. v. Principis Cap. LLC*,
    2020 WL 8817588 (S.D.N.Y. Oct. 8, 2020)..............................................56

*Brash v. Richards*,
    149 N.Y.S.3d 560 (App. Div. 2021)...........................................44, 45, 47, 48

*Bugliotti v. Republic of Argentina*,
    952 F.3d 410 (2d Cir. 2020) ......................................................................22

*Canada Life Assurance Co. v. LaPeter*,
    563 F.3d 837 (9th Cir. 2009) .....................................................................26

*Carney v. Philippone*,
    332 F.3d 163 (2d Cir. 2003) ......................................................................54

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ........................................................................9

*China AI Cap. Ltd. v. DLA Piper LLP (US)*,
    2023 WL 5016492 (S.D.N.Y. July 28, 2023) ...........9, 10, 18, 41, 42, 57, 58

*Christian v. Heng Zhang*,
    2022 WL 1447046 (N.Y. Sup. Ct. May 6, 2022)......................................48

*Citibank, N.A. v. Nyland (CF8) Ltd.*,
    839 F.2d 93 (2d Cir. 1988) ........................................................................26

*City of N.Y. v. Golden Feather Smoke Shop, Inc.*,
    597 F.3d 115 (2d Cir. 2010) ......................................................................48

*Cruz v. Guaba*,
    2022 WL 364072 (N.Y. Sup. Ct. Feb. 7, 2022).......................................46

*De Carlo v. Ratner*,
  204 F. Supp. 2d 630 (S.D.N.Y. 2002)....................................................40, 41, 42

*Decker v. Nagel Rice LLC*,
  2010 WL 2346608 (S.D.N.Y. May 28, 2010)....................................................57

*DeSuze v. Ammon*,
  990 F.3d 264 (2d Cir. 2021) ............................................................22

*Doe v. Trump Corp.*,
  6 F.4th 400 (2d Cir. 2021) ..............................................................53

*Doe v. United States*,
  76 F.4th 64 (2d Cir. 2023) ..............................................................51

*Esposito v. Gary*,
  844 F. App'x 448 (2d Cir. 2021) ............................................20, 40, 41, 42, 43

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
  545 U.S. 308 (2005)....................................................2, 14, 18, 23, 32

*Gunn v. Minton*,
  568 U.S. 251 (2013)........................................2, 4, 16, 18, 23, 27, 28, 29, 31, 34

*Gurvey v. Cowan, Liebowitz & Latman, P.C.*,
  757 F. App'x 62 (2d Cir. 2018) ......................................................39

*Hoffenberg v. Bodell*,
  2002 WL 31163871 (S.D.N.Y. Sept. 30, 2002)....................................................41

*Johnson v. Nyack Hosp.*,
  86 F.3d 8 (2d Cir. 1996) ..............................................................53

*Jusino v. Fed'n of Catholic Teachers, Inc.*,
  54 F.4th 95 (2d Cir. 2022) ............................................................53

*KeyBank Nat'l Ass'n v. Monolith Solar Assocs. LLC*,
  2020 WL 1157650 (N.D.N.Y. Mar. 10, 2020)....................................................26

*KLC, Inc. v. Trayner*,
  426 F.3d 172 (2d Cir. 2005) ..........................................................48

*Koral v. Saunders*,
   36 F.4th 400 (2d Cir. 2022) .........................................................21, 50

*Kosmider v. Whitney*,
   132 N.E.3d 592 (N.Y. 2019)................................................................45

*Lafayette-Boynton Apartment Corp. v. Lopez*,
   2022 WL 2316461 (S.D.N.Y. June 28, 2022)......................................38

*Lanza v. Whole Foods Mkt. Grp.*,
   2023 WL 128757 (N.Y. Sup. Ct. Jan. 6, 2023)....................................48

*Lawsky v. Condor Cap. Corp.*,
   2015 WL 4470332 (S.D.N.Y. July 21, 2015) ...............................26, 58

*Loeb v. Cnty. of Suffolk*,
   2023 WL 4163117 (E.D.N.Y. June 23, 2023) .............................45, 46

*McCoy v. Feinman*,
   785 N.E.2d 714 (N.Y. 2002)...............................................................40

*McLaughlin v. Snowlift, Inc.*,
   185 N.Y.S.3d 212 (App. Div. 2023)....................................................47

*Meridien International Bank v. Liberia*,
   23 F. Supp. 2d 439 (S.D.N.Y. 1998)...................................................52

*MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, LLP*,
   701 F. Supp. 2d 518 (S.D.N.Y. 2010).................................................40

*Murphy v. Harris*,
   177 N.Y.S.3d 559 (App. Div. 2022)....................................................48

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*,
   770 F.3d 1010 (2d Cir. 2014) ......................................................30, 32

*Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*,
   153 F.3d 1289 (11th Cir. 1998) ..........................................................26

*NeuroRepair, Inc. v. Nath Law Grp.*,
   781 F.3d 1340 (Fed. Cir. 2015) ..........................................................36

*New Life Ventures, Inc. v. Locke Lord LLP*,
2019 WL 13212632 (E.D. Tex. Sept. 27, 2019) .........................................25, 28

*Nordwind v. Rowland*,
584 F.3d 420 (2d Cir. 2009) ...............................................................54

*Noskov v. Roth*,
2020 WL 4041125 (S.D.N.Y. July 17, 2020) ....................................39

*O'Hara v. Silver*,
2022 WL 17416922 (N.Y. Sup. Ct. Nov. 18, 2022) .........................48

*Old Dominion Electric Cooperative v. PJM Interconnection, LLC*,
24 F.4th 271 (4th Cir. 2022) .......................................................27, 28

*Port Auth. of N.Y. & N.J. v. Allianz Ins. Co.*,
443 F. Supp. 2d 548 (S.D.N.Y. 2006).................................................38

*Pyne v. Block & Assocs.*,
760 N.Y.S.2d 30 (App. Div. 2003).....................................................57

*Ray v. Ray*,
22 F.4th 69 (2d Cir. 2021) ...............................................................22

*Reserve Mgmt. Co. v. Willkie Farr & Gallagher LLP*,
2012 WL 4378058 (S.D.N.Y. Sept. 25, 2012)....................................35

*Roach v. Cornell University*,
172 N.Y.S.3d 215 (App. Div. 2022).............................................47, 48

*Roeder v. J.P. Morgan Chase & Co.*,
523 F. Supp. 3d 601 (S.D.N.Y. 2021)................................................51

*Rubens v. Mason*,
387 F.3d 183 (2d Cir. 2004) ..............................................................24

*Saylor v. Bastedo*,
100 F.R.D. 44 (S.D.N.Y. 1983) .........................................................50

*Saylor v. Lindsley*,
302 F. Supp. 1174 (S.D.N.Y. 1969)...................................................50

*Scheja v. Sosa*,
    771 N.Y.S.2d 554 (App. Div. 2004) ............................................................. 44, 49

*Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*,
    2013 WL 3357921 (S.D.N.Y. July 2, 2013) ..................................................... 56

*Schutz v. Kagan Lubic Lepper Finkelstein & Gold LLP*,
    552 F. App'x 79 (2d Cir. 2014) ........................................................................ 56

*Shumsky v. Eisenstein*,
    750 N.E.2d 67 (N.Y. 2001) .................................................................. 20, 39, 43

*Smalls v. Collins*,
    10 F.4th 117 (2d Cir. 2021) ............................................................................ 51

*Somma v. Dansker & Aspromonte Assocs.*,
    843 N.Y.S.2d 577 (App. Div. 2007) ................................................................ 57

*Sousa v. BP Oil, Inc.*,
    1995 WL 842003 (D. Mass. Sept. 12, 1995) .................................................. 51

*Tantaros v. Fox News Network, LLC*,
    12 F.4th 135 (2d Cir. 2021) .............................................. 3, 18, 23, 24, 29, 35

*Vasquez v. Tri-State Lumber Ltd.*,
    2023 WL 3163164 (N.Y. Sup. Ct. Apr. 27, 2023) ...................................... 45, 48

*Warren v. Garvin*,
    219 F.3d 111 (2d Cir. 2000) ............................................................................ 53

*Wolfson v. Ernst*,
    112 F. Supp. 3d 167 (S.D.N.Y. 2015) ............................................................. 31

**Statutes**

28 U.S.C. § 1291 ..................................................................................................... 6

28 U.S.C. § 1331 .................................................................................................. 2, 6

28 U.S.C. § 1367 ................................................................................................... 37

N.Y. Exec. Law 29-a ........................................................................................ 45, 46

**Rules**

Fed. R. Civ. P. 66...........................................................................................27

N.Y. C.P.L.R. § 214(6)................................................................................39

**Regulations**

9 N.Y.C.R.R. § 8.202.8...............................................................................44

9 N.Y.C.R.R. § 8.202.67.............................................................................44

9 N.Y.C.R.R. § 8.202.72.............................................................................44

## INTRODUCTION

Link Motion, a Chinese company incorporated in the Cayman Islands, filed this meritless malpractice action against its former counsel, DLA Piper LLP (US),[1] which the district court correctly dismissed. A copycat of a failed derivative suit that is now the subject of Rule 11 sanctions, this action arises from a securities litigation filed against Link Motion by plaintiff Wayne Baliga in December 2018 asserting a litany of misconduct by Link Motion's officers and directors, in particular its founder and chairman of the board, Vincent Shi. *See Baliga v. Link Motion, Inc.*, No. 1:18-cv-11642 (S.D.N.Y.) ("*Baliga* action").

When Baliga's counsel sent a courtesy copy of his pleadings to DLA based on its earlier representation of Link Motion in an unrelated corporate matter, a DLA partner repeatedly attempted to contact Link Motion about the lawsuit, without success. After receiving no direction from Link Motion, no payment for its prior work, and no indication that Link Motion wanted to retain DLA to defend the *Baliga* action, the firm sought leave to withdraw as counsel in that action, which the district court granted. The court also appointed a Receiver to manage Link Motion and its assets in place of its former board of directors.

---

[1] Appellees will use "DLA" throughout this brief as shorthand for DLA Piper LLP (US) and its partner Caryn G. Schechtman.

Shi then hired Felicello Law (Link Motion's counsel here) and, after years of failed efforts to dismiss the *Baliga* action, launched a litigation fusillade against DLA, the Receiver, and others. This action, asserting malpractice claims based on DLA's purported failure to act when Link Motion ignored its repeated inquiries about the *Baliga* action, is one of two nearly identical suits brought by the same lawyers on behalf of entities associated with Shi. In the other, a derivative action by Link Motion shareholder China AI, a magistrate judge recommended that counsel be sanctioned for asserting the same meritless malpractice claim they seek to resurrect for Link Motion here.

Undeterred, Link Motion makes two arguments on appeal in an attempt to prolong its baseless litigation against DLA. *First*, Link Motion argues that the district court erred in denying its motion to remand the lawsuit to New York state court. But the district court properly exercised federal question jurisdiction under 28 U.S.C. § 1331 because Link Motion's malpractice claim "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *see also Gunn v. Minton*, 568 U.S. 251, 258 (2013). As Link Motion concedes, its malpractice claim rises and falls on the allegation that the district court would not have appointed the Receiver in the *Baliga* action if DLA

had argued that Baliga lacked standing to assert his claims derivatively. Those questions, concerning Baliga's standing to seek a receiver and the district court's subject-matter jurisdiction to appoint one, are "necessarily raised" and "actually disputed" in this malpractice action.

Moreover, although a typical malpractice action requires the court to answer hypothetical questions about whether the outcome of an underlying matter *would have* been different if the attorney defendants had acted differently, here the *Baliga* court already answered that question. Specifically, in response to Shi's motion to discharge the Receiver, the *Baliga* court held that "Baliga had standing to bring his derivative securities claims" and "the Receivership Order should not be vacated *ab initio*." *Baliga v. Link Motion Inc.*, 2022 WL 3699339, at *5 (S.D.N.Y. Aug. 25, 2022); SPA-17-18. Because this malpractice action against DLA, if remanded, would invite the state court to reconsider the district court's conclusion as to each of these questions, the federal issues raised by Link Motion's claim are "important not solely to the parties in the immediate case but also to the federal system as a whole." *Tantaros v. Fox News Network, LLC*, 12 F.4th 135, 145 (2d Cir. 2021) (cleaned up). And the "unique federalism concerns [that] abound in this case . . . outweigh the State Court's special responsibility for maintaining standards among members of the licensed professions." SPA-25 (citation omitted).

Link Motion's contrary arguments attack a strawman. Neither DLA nor the district court suggested removal was proper simply because the alleged malpractice occurred in a federal lawsuit. *Contra* Br. 2, 17, 19. Rather, this action involves federal issues because it collaterally attacks multiple federal-court orders inextricably intertwined with Link Motion's allegations. It is Link Motion—not DLA—that would impose a categorical rule, erroneously suggesting that *Gunn* precludes removal of *any* state-law malpractice claim. But the Supreme Court's analysis in *Gunn* was expressly case-specific, holding that "something more, demonstrating that the question is significant to the federal system as a whole," was "missing" in that case. 568 U.S. at 264. *Gunn*'s "missing" federal interest is present here, where Link Motion would have the state court second-guess decisions the district court has actually rendered, without any "opportunity for correction by the federal courts." SPA-23-24.

At bottom, Link Motion's malpractice claim calls into question the appointment of a *federal* receiver in a *federal* securities action based on arguments previously raised and rejected in *federal* court. Link Motion's remand arguments would require a state court to sit in review of a federal court's decision concerning its own jurisdiction to appoint the Receiver and impose related costs on Link Motion. On these facts, removal was proper.

*Second*, Link Motion's attack on the district court's determination that its malpractice claim was barred by the three-year statute of limitations is similarly unavailing. Link Motion argues that its claim did not accrue until March 1, 2019, when DLA formally withdrew from the *Baliga* action, but that argument contravenes the well-established New York rule that a malpractice claim accrues when the allegedly negligent act occurs, not when the representation formally ends or the court permits withdrawal. Here that alleged act occurred, and the claim accrued, on January 21, 2019, when the parties in the *Baliga* action filed the stipulation that supposedly caused Link Motion's injuries. The three-year limitations period therefore expired on January 21, 2022, nearly eight months before Link Motion filed this action on September 12, 2022.

No tolling doctrine excuses the long delay. The "continuous representation" doctrine does not apply because it requires an ongoing relationship of trust between lawyer and client. Here, however, DLA's repeated and urgent attempts to engage Link Motion concerning the pending motions in the *Baliga* action were met with near total silence and repeated refusals by Link Motion to pay outstanding bills.

New York's Executive Order 202.8, which temporarily suspended statutes of limitations between March and November 2020, did not toll limitations periods that expired after those dates—and is insufficient to save Link Motion's untimely filing in any event. Nor is Link Motion entitled to equitable tolling, which tolls a

limitations period only where the *defendant*'s misconduct prevents a timely filing. Link Motion does not (because it cannot) make that showing here, where the Receiver remained free to bring a malpractice action on behalf of Link Motion at any time and simply declined to do so—plainly because any such action is meritless.

The Court may also affirm on the alternative ground that Link Motion fails to state a claim for malpractice. Link Motion simply speculates about what may have happened had DLA asserted certain arguments at the outset of the *Baliga* action. But bare speculation does not suffice for a malpractice claim under New York law. And even more glaringly, no speculation is necessary because the *Baliga* court already rejected the central assertion underlying Link Motion's claim against DLA— specifically, that Baliga's alleged lack of derivative standing to assert state-law claims, or unspecified defects in his federal securities claims, should have foreclosed the appointment of the Receiver. In other words, the outcome would have been the same whether or not DLA had made those arguments, meaning Link Motion cannot show causation as a matter of law.

This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367(a). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Did the district court correctly deny the motion to remand and exercise federal jurisdiction over Link Motion's malpractice claim where (a) that claim necessarily raised substantial, disputed federal issues that could be adjudicated in federal court without undermining the federal-state balance, and, alternatively, (b) the district court had supplemental jurisdiction over that claim?

2.    Did the district court properly dismiss Link Motion's malpractice claim as time-barred, where the claim was filed outside the applicable three-year statute of limitations and Link Motion failed to establish the limitations period was tolled?

3.    Should the district court's dismissal order be affirmed on the alternative ground that Link Motion failed to state a claim for legal malpractice?

## STATEMENT OF THE CASE

### I.    Factual Background

#### A.    DLA Undertook a Limited Engagement for Link Motion.

Link Motion is a technology business co-founded by Shi in China and incorporated in the Cayman Islands.  JA-11, 21, 103.  Before 2019, Link Motion listed American depository shares ("ADS") on the New York Stock Exchange.  JA-23.  In 2018, Link Motion retained DLA in connection with a corporate matter.  JA-11.  The scope of DLA's representation was limited to "general corporate advice as well as in connection with an issuance of Class B Shares."  JA-22.

## B. Link Motion Declined to Retain DLA in the *Baliga* Action.

In December 2018, a Link Motion ADS-holder, Wayne Baliga, sued Shi and other Link Motion directors and officers for breach of fiduciary duty, unjust enrichment, and violation of federal securities laws. JA-22-23; *Baliga*, Dkt. 1. Baliga accused Shi and others of "stripping the Company of all its value by transferring ownership of [Link Motion's] most valuable assets . . . to unknown third parties." *Baliga*, Dkt. 1 ¶ 3. Because DLA had previously represented Link Motion, Baliga's counsel sent the pleadings to DLA on the day the action was filed. JA-26. Baliga's counsel indicated that Baliga would seek "a temporary restraining order, preliminary injunction, and appointment of [a receiver]" the next day. JA-22, 26.

In light of the imminent filing, and although DLA had not been retained, DLA partner Caryn Schechtman emailed Link Motion and offered to "send an associate" to inform the court "that we have received no instruction from the Company due to the time difference and language barriers." JA-26. The day after the complaint was filed, the district court granted a TRO and directed the parties to submit a joint letter specifying whether defendants would agree to extend the TRO beyond 14 days. *Baliga*, Dkt. 7. One week later, the parties filed a joint letter agreeing to extend the TRO in exchange for a January 21, 2019 deadline for Link Motion's response to Baliga's request for preliminary injunction and the appointment of a receiver. *Baliga*, Dkt. 20. The district court agreed. *Baliga*, Dkt. 21.

For more than a month after the TRO was entered, DLA urgently sought guidance from Link Motion about how to proceed—including whether it would retain DLA—but the Company repeatedly declined to respond. JA-28-31; *see also China AI Cap. Ltd. v. DLA Piper LLP (US)*, 2023 WL 5016492, at *2 (S.D.N.Y. July 28, 2023) (collecting DLA's unanswered communications). For example, on January 14, 2019, as the deadline to oppose Baliga's motion neared, DLA wrote to Shi and the entire Link Motion board in both English and Mandarin: "We have repeatedly asked for instruction on how to proceed but have not received any guidance from the Company or the individual defendants and advised that if we do not receive payment for legal services, *we cannot take on this litigation matter*." *China AI*, 2023 WL 5016492, at *2 (emphasis added).[2] "If we do nothing," DLA warned, "the motion may be granted, which may include such relief as appointing a receiver over the company." *Id.*

Link Motion did not respond. DLA again wrote on January 19 (again in English and Mandarin) that "[i]f we do not hear back from you within 24 hours, DLA will assume that we have Link Motion's consent not to oppose the motion."

---

[2] This email is incorporated by reference at paragraph 47 of the complaint. *See* JA-30; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("For purposes of" Rule 12(b)(6), "the complaint is deemed to include . . . documents incorporated in it by reference.").

*China AI*, 2023 WL 5016492, at *3.[3]  DLA added:  "we will also assume that we have Link Motion's consent to withdraw from representation."  *Id.*  As the magistrate judge held after reviewing those and related communications, Schechtman acted "diligently" by attempting to discuss the Baliga action with Link Motion "on numerous occasions," but "[h]er communications went unanswered," and "Defendants were left with no guidance as to how to proceed."  *Id.* at *11 ("Against that backdrop of unanswered communications and nearly complete radio silence from Shi, Plaintiff's counsel could not have in good faith believed that it would be able to show that Defendants breached a duty to Link Motion").

In a proposed stipulation and order filed on January 21, 2019, Link Motion agreed not to oppose the preliminary injunction in exchange for additional time to answer Baliga's complaint.  *Baliga*, Dkt. 22.  The court granted the preliminary injunction and appointed the Receiver on February 1, 2019.  JA-634.  On March 1, 2019, DLA requested, and the court granted, leave to withdraw because Link Motion had "failed to cooperate in the representation by failing to respond to inquiries," "consented to DLA's withdrawal," and "indicated that it does not have sufficient assets and cannot pay DLA's legal fees."  JA-621-29.

---

[3]  This email is incorporated by reference at paragraph 51 of the complaint.  JA-31.

## C. Shi Retained Counsel and Attacked the Receivership.

Shi then retained counsel from Felicello Law P.C.—the firm now representing Link Motion—to defend the *Baliga* action. *Baliga*, Dkts. 35-38. Shi, Link Motion, and their shared counsel have since launched a multifront attack on the Receiver and DLA—in the *Baliga* action, in this case, and in a related derivative shareholder lawsuit, *China AI Cap. Ltd. v. DLA Piper LLP (US)*, No. 21-cv-10911 (S.D.N.Y.) ("*China AI* action"), where Shi and Link Motion's counsel also represents plaintiff China AI.[4] SPA-4-9.

## D. Link Motion Filed a Malpractice Claim Rehashing Arguments Already Rejected in the Related Cases.

The malpractice claim is a thinly veiled attempt to relitigate the district court's decisions in the *Baliga* action. Shi first sought vacatur of the receivership order in March 2019, just weeks after DLA had withdrawn as counsel, arguing that Baliga had failed to present proof that Link Motion's board had "permitted DLA Piper to consent to the appointment of a receiver." *Baliga v. Link Motion Inc.*, 385 F. Supp. 3d 212, 222 (S.D.N.Y. 2019). The district court denied the motion, holding that Link Motion's consent was irrelevant because Baliga had submitted multiple

---

[4] There is evidence that Shi is "directly connected to" and "control[s]" China AI and engineered China AI's acquisition of Link Motion shares. *Baliga*, Dkt. 220-2, at 3; *Baliga*, Dkt. 220-3, at 2; *see also Baliga*, Dkt. 141, at 8-10; SPA-47 ("Shi's crusade to vindicate his interests through counsel has been consistent. And the overlapping nature of legal representation as between LKM, Shi, and China AI raises the specter that Shi has been the one pulling the strings all along.").

"unrefuted" declarations "sufficient to show that the appointment of the Temporary Receiver was necessary." *Id.*

A year later, in October 2020, Baliga amended his complaint to replace his derivative claims with direct claims. *See Baliga*, Dkt. 166, at 40-44. At that point, Shi again moved for an order declaring the receivership void *ab initio* on the ground that Baliga had lacked "standing" to assert derivative claims under Cayman Islands law, *Baliga*, 2022 WL 3699339, at *4—the same argument Link Motion now claims DLA should have made at the outset of the *Baliga* action, JA-23-28, 37-38. The *Baliga* court rejected Shi's arguments, holding that Baliga had standing on the basis of his *federal* securities claims and that the court therefore "possessed subject matter jurisdiction" to appoint the Receiver. *Baliga*, 2022 WL 3699339, at *5; *accord Baliga v. Link Motion Inc.*, 2022 WL 2531535, at *10 (S.D.N.Y. Mar. 9, 2022) (R&R). The district court also concluded that Link Motion should bear the costs of the receivership through the date Baliga withdrew his derivative claims. *Baliga*, 2022 WL 3699339, at *6-7; *accord Baliga*, 2022 WL 2531535, at *19 (R&R) (recommending that "the Company be required to pay the reasonable costs incurred by the Receiver . . . up to October 5, 2020").

Meanwhile, "the Receiver refused multiple times" to exercise his authority on behalf of Link Motion to sue DLA for malpractice. JA-36. Seeking to sidestep the Receiver's decision, Shi's counsel (Link Motion's counsel here) filed suit against

DLA on a derivative basis on behalf of China AI. *China AI*, Dkt. 1. China AI asserted a malpractice claim that was substantively identical to the one now asserted by Link Motion. That claim alleged that DLA committed malpractice in connection with the *Baliga* action by failing to challenge Baliga's purported lack of derivative standing in response to his request for a preliminary injunction and the appointment of the Receiver, supposedly resulting in hundreds of millions of dollars in damage to Link Motion. *Id.* DLA sought and obtained leave to move to dismiss the China AI complaint. Just days before DLA was to file its motion, however, China AI sought to voluntarily dismiss the action. *China AI*, Dkt. 22.

The reason for the dismissal became clear when it was revealed that the Link Motion board had convened a secret meeting and voted to authorize the instant malpractice action. SPA-8. Link Motion hired the lawyers representing Shi and China AI and filed this copycat lawsuit in the New York Supreme Court, arguing that DLA should have raised the same challenge to Baliga's standing that the district court already rejected. JA-19-20, 25-37. The action, filed only 18 days after the district court rejected the standing argument in the *Baliga* action, seeks to shift the costs of the receivership from Link Motion to DLA. JA-35. In other words, because the court's decision in the *Baliga* action rendered the malpractice case unwinnable as a matter of law, Link Motion and its counsel violated the receivership order in the *Baliga* action and fled to state court in the hopes of end-running the *Baliga* court's

rulings. DLA therefore removed the case to federal court, where it was designated as "related" to the *Baliga* action and assigned to the same judge. JA-1, 15.

Following removal, the district court held that the board had "violat[ed]" the district court's prior orders by authorizing this suit while the Receiver retained control of Link Motion and "prohibited" the board "from 'convening and voting' on taking any new actions not directed by the court-appointed receiver." JA-48-49; *see Baliga v. Link Motion, Inc.*, 2022 WL 6091994, at *2, *5 (S.D.N.Y. Oct. 7, 2022). The district court nonetheless permitted this action to proceed. JA-49.

## II. Procedural History

### A. Link Motion's Unsuccessful Motion to Remand

Link Motion moved to remand this case to state court. JA-151. The district court denied the motion, holding that DLA had satisfied the *Grable-Gunn* test for removing state law claims that "implicate significant federal issues." SPA-12 (quoting *Grable*, 545 U.S. at 312).

The district court began by observing that the parties "do not dispute" that DLA had met the first two prongs of the *Grable-Gunn* test—that a federal issue is "necessarily raised" and "actually disputed" here. SPA-13.

As to the third factor, the district court held that the federal issue was "substantial" because the "content and timing" of Link Motion's ("LKM") state-court malpractice action showed it to be "merely a collateral attack on the Court's

past orders." SPA-16-17.  Unlike a typical malpractice action, which asks whether the underlying case would have turned out differently but for the lawyer's conduct, "the State Court here is not faced with a 'hypothetical case within a case,' because this Court has *already addressed* Baliga's standing and the propriety of the receivership." SPA-16 (emphasis added).  "Yet, dissatisfied with that result, LKM wasted no time in improperly voting to take over the mirror-image malpractice lawsuit brought by China AI pending before this *federal* Court and running across the square to refile it in the State Court." SPA-20.  "Although framed as a malpractice suit, what LKM essentially seeks is reconsideration by the State Court of this Court's findings as to jurisdiction and the propriety of the Receiver." SPA-24.

The district court concluded that Link Motion's transparent bid for "a second chance at a favorable decision . . . raises a unique federal interest that would affect the justice system as a whole" because it would "enable state courts to undermine a federal court's authority to manage its proceedings, vindicate its authority, and effectuate its decrees." SPA-16 (quotation marks omitted).  The court also observed that Link Motion was attempting to shift the costs of the receivership to DLA, even though the court had already held that such costs were properly borne by Link Motion.  SPA-21.

As to the fourth *Grable-Gunn* factor, which asks whether the federal issue is "capable of resolution in federal court without disrupting the federal-state balance," the district court concluded that "unique federalism concerns abound in this case." SPA-25. The court was "persuaded that such interests outweigh the State Court's 'special responsibility for maintaining standards among members of the licensed professions.'" SPA-25 (quoting *Gunn*, 568 U.S. at 264). And "because the issues of inconsistency and forum shopping that may arise by allowing the State Court to act are at odds with Congressional expectations of the federal-state balance, the Court determine[d] that the final *Grable-Gunn* factor is satisfied here." SPA-26.[5]

"Undeterred by the Court's admonishment that [it] has already had 'multiple apples in the course of this litigation,'" Link Motion took "another bite" and moved for reconsideration. JA-255, 276 (quoting SPA-20). The district court denied the motion and took the opportunity "to clarify" that "*Gunn* is distinct because, while the underlying federal issue was raised, it was not actually *answered* by the federal courts" in that case. JA-276-77 (emphasis added). Here, by contrast, the district court "already actually addressed and ruled upon the merits of the federal issues

---

[5] Defendants also argued below that the court had supplemental jurisdiction over this action. Because it denied the remand motion on other grounds, the district court did not address this alternative argument, which DLA reasserts here. *See* SPA-14.

underlying the malpractice action in the related" *Baliga* action. JA-278. As a result, this case presents "unique federalism issues that were not present in *Gunn*." JA-278.

### B. The District Court Dismisses the Malpractice Action.

DLA filed a pre-motion letter seeking dismissal on the grounds that Link Motion's malpractice claim was time-barred and failed on the merits in multiple independent respects, including that Link Motion could not plausibly allege causation. JA-43-45. Link Motion responded, JA-50, and the parties consented to treating the letter exchange as a fully briefed motion to dismiss, SPA-36.

The district court dismissed the single-count complaint with prejudice on statute of limitations grounds. SPA-37. The court concluded that Link Motion's malpractice claim expired on January 21, 2022, "nearly eight months before LKM brought suit," and that Link Motion's various tolling arguments were meritless. SPA-40-44. Because the time bar fully disposed of the malpractice claim, the district court declined to address DLA's alternative grounds for dismissal. SPA-37.

### C. The Magistrate Judge Recommends Sanctioning Counsel in the *China AI* Action for Filing a Frivolous Complaint With Demonstrably False Allegations.

After the district court entered final judgment in this case, the magistrate judge in the *China AI* action recommended imposing Rule 11 sanctions on China AI and Link Motion's shared counsel for filing the same "frivolous" malpractice claim asserted on behalf of Link Motion here. *China AI Cap. Ltd. v. DLA Piper LLP (US)*,

2023 WL 5016492, at *11, *15 (S.D.N.Y. July 28, 2023). The magistrate found sanctions warranted because China AI's factual allegations were demonstrably "false" and the malpractice claim was "objectively unreasonable." *Id.* at *8.

## SUMMARY OF ARGUMENT

I.     Removal was proper because the district court had original federal question jurisdiction. A state-law cause of action "aris[es] under" federal law if it presents a federal issue that is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258 (citing *Grable*, 545 U.S. at 314). Link Motion does not dispute that the first two factors are satisfied. *See* JA-170 n.4.

The third prong of the *Grable-Gunn* test, substantiality, turns on whether the federal issues are important "to the federal system as a whole." *Tantaros*, 12 F.4th at 145. That standard is satisfied here because "the content and timing" of Link Motion's "decision to bring its malpractice suit in State Court constitutes merely a collateral attack on the Court's past orders." SPA-16-17. Unlike run-of-the-mill malpractice claims that ask, hypothetically, "what would have happened in the prior federal proceeding if a particular argument had been made," *Gunn*, 568 U.S. at 261-62, the district court here "already actually addressed and ruled upon the merits of

the federal issues underlying the malpractice action," JA-278. None of Link Motion's arguments meaningfully grapples with this unavoidable reality.

Nor, under the fourth *Grable-Gunn* factor, does the district court's exercise of jurisdiction disrupt the federal-state balance. No matter the outcome of this appeal, run-of-the-mill malpractice claims will continue to be litigated in state court. Link Motion's arguments fail to weigh the state's interest in regulating lawyers against countervailing federal interests and ignore its own prior argument that the federal court should exercise a supervisory role over the malpractice claim in state court— a suggestion the district court rightly deemed "inappropriate," SPA-25-26. The federal-state balance favors the exercise of federal jurisdiction in this case.

In the alternative, this Court should affirm the denial of the motion to remand because the district court had supplemental jurisdiction. Although supplemental jurisdiction typically does not provide an independent basis for removal, this Court has allowed removal of state-court actions that share "a common nucleus of operative fact" with separate, pending federal actions. *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006). In other words, "the existence of subject matter jurisdiction in one action [can] provide supplemental jurisdiction over claims in a related action." *Id.* Because the facts of the pending *Baliga* action "substantially overlap[]" with the facts here, the *Baliga* action "necessarily brought the facts underlying the state claim before the court." *Id.*

II.     The district court properly dismissed the legal malpractice claim as time-barred.  "An action to recover damages for legal malpractice accrues when the malpractice is committed."  *Shumsky v. Eisenstein*, 750 N.E.2d 67, 69 (N.Y. 2001).  Here, the act that supposedly caused Link Motion's alleged damages—DLA's purported failure to raise a standing defense in response to Baliga's motion—occurred at the latest on January 21, 2019, the date Link Motion stipulated that it would not oppose Baliga's motion in exchange for more time to respond to the complaint.  The three-year limitations period thus expired on January 21, 2022, well before Link Motion filed this action on September 12, 2022.

Link Motion's tolling arguments all fail.  The "continuous representation" doctrine does not help Link Motion because it pauses the statute of limitations on a malpractice claim only as long as a "relationship of trust and confidence" exists between client and attorney.  *Esposito v. Gary*, 844 F. App'x 448, 449 (2d Cir. 2021).  Here, however, Link Motion's own pleadings establish that Link Motion failed to retain DLA to handle the *Baliga* action, ignored DLA's urgent attempts to engage the company on whether and how to respond to Baliga's motions, and failed to pay DLA for prior legal work.  And even if Link Motion's "continuous representation" arguments had merit, which they do not, that doctrine alone cannot save its claim unless another basis for tolling applies, which Link Motion fails to establish.

Link Motion attempts, first, to avail itself of New York Executive Order 202.8, which "temporarily suspend[ed]" deadlines that fell between March 19, 2020 and November 3, 2020, when the order expired. But by its plain text, that executive order did not "in any way" affect limitations periods that expired *after* November 3, 2020, *Baker v. 40 Wall St. Holdings Corp.*, 161 N.Y.S.3d 723, 724 (Sup. Ct. 2022), as Link Motion's did here.

Link Motion relies, second, on the doctrine of equitable tolling, which it concedes requires "extraordinary" circumstances. Br. 36. But a plaintiff can avail itself of New York law's equitable tolling doctrine only where "*the defendant*" prevented it from timely filing suit. *Koral v. Saunders*, 36 F.4th 400, 409-10 (2d Cir. 2022) (emphasis added). Here, Link Motion asserts only that *the Receiver* declined to file the malpractice action while in control of the Company and its potential legal claims. JA-36, 637. Link Motion does not allege that DLA had anything to do with that decision.

III.    The Court may affirm dismissal on the alternative ground that Link Motion fails to plausibly allege the causation element of its malpractice claim. Link Motion will never be able to prove the central allegation in the causation analysis: that the district court would have declined to appoint the Receiver if only DLA had challenged Baliga's derivative standing. That is because the district court in the *Baliga* action already considered and rejected the argument—made by the same

counsel representing Link Motion here—that Baliga's purported lack of derivative standing rendered the receivership void *ab initio*.

Link Motion cannot satisfy the causation element of its malpractice claim for the additional reason that its alleged injury traces to multiple intervening causes, including the district court's independent judgment that good cause existed to appoint the Receiver, omissions by counsel hired after DLA withdrew from the *Baliga* action, and alleged inaction by the Receiver. Each is independently sufficient to preclude a finding of causation and hence liability as to DLA.

## STANDARD OF REVIEW

The Court reviews *de novo* all issues on appeal except the district court's rejection of Link Motion's equitable tolling defense. *Bugliotti v. Republic of Argentina*, 952 F.3d 410, 412-13 (2d Cir. 2020) (subject-matter jurisdiction); *Ray v. Ray*, 22 F.4th 69, 72 (2d Cir. 2021) (dismissal on statute of limitations grounds). Where, as here, the district court has determined that "equitable tolling is inappropriate," the Court will "review the legal premises for that conclusion *de novo*, the factual bases for clear error, and the ultimate decision for abuse of discretion." *DeSuze v. Ammon*, 990 F.3d 264, 268 (2d Cir. 2021).

## ARGUMENT

### I. Removal Was Proper Because the District Court Had Federal "Arising Under" Jurisdiction Over the Action.

Suits alleging state-law causes of action "arise under" federal law if the "state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. Thus, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. "The *Grable-Gunn* test reflects the commonsense notion that a federal court ought to be able to hear state law claims that turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Tantaros*, 12 F.4th at 141. The malpractice claim readily meets this test.

### A. It Is Undisputed That Link Motion's Malpractice Claim "Necessarily Raises" Federal Issues That Are "Actually Disputed."

Link Motion does not dispute that DLA satisfies the first two elements of the *Grable-Gunn* test: the malpractice claim "necessarily raises" federal issues that are "actually disputed."

The "necessarily raises" element "is met where the plaintiff's right to relief necessarily depends on resolution of a question of federal law." *Tantaros*, 12 F.4th at 141 (alteration omitted). To prevail on its legal malpractice claim, Link Motion must plausibly allege "but for" causation—in other words, "but for" DLA's alleged negligence, "what would have been a favorable outcome was an unfavorable outcome." *Rubens v. Mason*, 387 F.3d 183, 189-90 (2d Cir. 2004) (citation omitted). Link Motion's ability to establish causation will therefore turn on whether it can prove in state court—*contrary to the district court's express rulings* in the *Baliga* action—that the district court would not have appointed the Receiver had DLA argued that Baliga "lacked standing," or that "Baliga's securities claims otherwise failed to support his request" for the receivership. JA-20, 23-29, 37-38. Those federal issues are both "necessarily raised" and "actually disputed." Link Motion conceded as much in its brief below, *see* JA-170 n.4, and does not suggest otherwise on appeal.

## B. The District Court Correctly Held That the Federal Issues Here Are "Substantial."

The third prong of the *Grable-Gunn* test asks whether the federal issues are "substantial—that is, important not solely to the parties in the immediate case but also to the federal system as a whole." *Tantaros*, 12 F.4th at 145. "An issue tends to be substantial if it is a nearly pure issue of law, one that could be settled once and for all and thereafter would govern numerous similar cases." *Id.* (cleaned up). As

the district court correctly held, that standard is satisfied here, where "the content and timing" of Link Motion's "decision to bring its malpractice suit in State Court constitutes merely a collateral attack on the Court's past orders." SPA-16-17.

> **1.     Link Motion's Malpractice Claim Is a Collateral Attack on Multiple Court Orders and Decisions by the Court-Appointed Receiver.**

The malpractice claim represents a collateral attack on the *Baliga* court's prior order considering and rejecting the argument Link Motion claims DLA should have raised: that Baliga lacked standing to seek provisional equitable relief. *See* 2022 WL 3699339, at *5. Moreover, on the basis of those rebuffed arguments, Link Motion attempts to recover costs of the receivership that the district court already concluded were rightly borne by Link Motion. *Id.* at *6-7.

Thus, on each of these issues, Link Motion "now seeks, under the guise of state law, what it has twice been denied under the federal law." *New Life Ventures, Inc. v. Locke Lord LLP*, 2019 WL 13212632, at *3 (E.D. Tex. Sept. 27, 2019). That is, dissatisfied with the district court's rulings that Baliga had standing to seek—and the court had subject-matter jurisdiction to grant—provisional equitable relief, Link Motion now hopes that a state court will disagree, overrule the district court, and shift the costs of the Receiver to DLA contrary to the district court's order.

Link Motion's causation theory also implicates the authority of the Receiver, serving as an officer of the district court in connection with the *Baliga* action, to

have taken certain actions that Link Motion now challenges as harmful to the company. *See, e.g.*, JA-13-14, 35-36. Indeed, by Link Motion's own admission, "the Receiver refused multiple times . . . to assert the Company's legal malpractice claim against Defendants." JA-36. And yet, although the Receiver remained in place as of September 2022, and remains in place pending a final accounting, Link Motion purports to have brought this action without the Receiver's approval. Thus, in addition to collaterally attacking the district court's prior jurisdictional determinations, this case constitutes an attempt to evade determinations made by the Receiver in his role "as an agent of [the] Court." *Lawsky v. Condor Cap. Corp.*, 2015 WL 4470332, at *11 (S.D.N.Y. July 21, 2015); *see also Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 98 (2d Cir. 1988).

There is plainly a substantial federal interest in ensuring that follow-on state-court actions cannot be used to undermine, evade, or otherwise attack duly authorized actions and decisions of a federal receiver acting in his official capacity. *See, e.g., Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289, 1291 (11th Cir. 1998) (noting "the primacy of federal law in the practice of federal receiverships"); *KeyBank Nat'l Ass'n v. Monolith Solar Assocs. LLC*, 2020 WL 1157650, at *4 (N.D.N.Y. Mar. 10, 2020) ("Federal law alone governs a federal receivership."); *see also Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837, 842

(9th Cir. 2009) (stressing "uniform administration of receiverships" in accordance with Federal Rule 66 and "historical practice in federal courts").[6]

This case closely tracks *Old Dominion Electric Cooperative v. PJM Interconnection, LLC*, 24 F.4th 271 (4th Cir. 2022), in which the Fourth Circuit permitted removal of state claims that set forth "the same factual contentions" and sought "the precise amount" of damages the plaintiff had failed to obtain in a proceeding before the Federal Energy Regulatory Commission ("FERC"), *id.* at 277-78. FERC had denied a petition for costs that exceeded the rates established in FERC-approved tariffs, and the D.C. Circuit affirmed. *Id.* at 275-77. When the plaintiff then attempted to obtain the same relief via common-law claims in state court, the Fourth Circuit permitted the defendant to remove the action under *Grable* and *Gunn*, holding the state claims implicated a substantial federal issue because plaintiff sought "to alter the terms" of the federal tariff and "ultimately to undermine FERC's statutory authority to ensure that all rates and charges . . . be just and reasonable." *Id.* at 286-87. As in this case, removal of a state-court action that

---

[6] Link Motion contends that remand would "have no impact on the District Court's power to manage the receivership because the District Court has already ordered that Link Motion should be permitted to proceed with the malpractice claim despite the receivership." Br. 21 n.10. That argument distorts the district court's decision, which held that Link Motion's board violated the court's previous orders by authorizing this lawsuit but nonetheless declined to treat the board's vote as "a nullity." JA-48-49.

sought to undermine a previous federal decision "did not disrupt Congress's intended division of labor between state and federal courts in any way—if anything, the removal could best be said to have righted that intended division." *Id.* at 288 (brackets omitted).

A federal district court in Texas reached a similar conclusion in *New Life Ventures*, 2019 WL 13212632, at *3, where it declined to remand a malpractice action that threatened to undermine the court's prior orders. The plaintiff in that case moved for attorneys' fees in a patent infringement case and then, after the district court denied the motion and the Federal Circuit affirmed, commenced a state-court malicious prosecution action to secure the same relief from the defendant and his attorneys. *Id.* at *1. The district court allowed defendants to remove the case under *Grable* and *Gunn* because the claim "would require a reopening of the issues already decided" in the federal patent suit. *Id.* at *3. Link Motion attempts to distinguish *New Life Ventures* by erroneously suggesting that the federal and state actions in that case involved mere claims for attorneys' fees. Br. 22. In fact, like this case, *New Life Ventures* addressed a state tort claim that gave rise to federal jurisdiction because it amounted to "little more than a collateral attack" on prior federal rulings. 2019 WL 13212632, at *3.

This case bears a closer resemblance to *Old Dominion* and *New Life Ventures* than to *Gunn*, where the Supreme Court held that federal courts did not have

exclusive jurisdiction over a malpractice claim challenging a lawyer's handling of a patent case. *Gunn*, 568 U.S. at 264-65. Whereas *Gunn* involved a run-of-the-mill "state court case-within-a-case inquiry" that "asks what would have happened in the prior federal proceeding if a particular argument had been made," *id.* at 261-62, there is nothing "hypothetical" about the inquiry here. To the contrary, the *Baliga* court specifically considered and decided the core standing question at issue here, making clear that DLA would not have secured a different outcome by raising this fruitless argument in response to Baliga's motion for appointment of a receiver. *See* 2022 WL 2531535, at *14 (R&R); 2022 WL 3699339, at *5; *see also* SPA-20 (observing that Link Motion "has had multiple apples in the course of this litigation, and taken bites at several of them").

The district court correctly exercised jurisdiction to vindicate the substantial federal interest in avoiding collateral attacks on duly issued federal-court orders, and in preventing state courts from second-guessing federal courts' determinations as to the scope of their own jurisdiction. "Being neither fact-bound nor situation-specific, the issue will inform all future [state-law malpractice] claims" that seek to second-guess federal issues *actually decided* by the federal court presiding over the underlying action. *Tantaros*, 12 F.4th at 146 (cleaned up).

## 2. Link Motion's Arguments Lack Merit.

Link Motion misapprehends the key inquiry—and the basis for the district court's holding—by contending that "none of the District Court's prior rulings" in the *Baliga* action "addressed the issue of legal malpractice." Br. 19. That is a red herring. As the district court correctly recognized, the causation *element* of the malpractice claim would require the state court to second-guess questions concerning federal jurisdiction that the *Baliga* court already decided. SPA-18; JA-278; *see also NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1022-23 (2d Cir. 2014) (exercising federal jurisdiction under *Grable-Gunn* where the duty "element" of plaintiff's state claims "necessarily raises disputed issues of federal securities law"). Thus, "the practical effect of finding remand appropriate in this narrow circumstance would affect the federal system as a whole, largely by providing parties a procedural loophole" to overrule unfavorable federal decisions in the guise of a state-law legal malpractice claim. SPA-24; *see also* SPA-23 ("the possibility that the State Court would not adhere to the law of the case raises the potential to undermine the development of a uniform body of securities law" (cleaned up)).

Link Motion similarly misconstrues *Gunn*'s holding, which it contends "made clear that legal malpractice claims . . . do not 'arise under' federal law and do not

provide federal question jurisdiction." Br. 16.[7] The Supreme Court said no such thing. Rather, the Court observed that it was "comfortable concluding that state legal malpractice claims *based on underlying patent matters* will rarely, if ever, arise under federal patent law for purposes of § 1338(a)," because "those cases are by their nature unlikely to have the sort of significance for the federal system necessary to establish jurisdiction." *Gunn*, 568 U.S. at 258-59 (emphasis added). That is a far cry from holding that federal courts can *never* have federal question jurisdiction over *any* state-law malpractice claim.

Indeed, *Gunn* explicitly announced a case-specific, rather than a categorical, rule: "[S]omething more, demonstrating that the question is significant to the federal system as a whole, is needed. That is missing here." 568 U.S. at 264. That case-specific approach reflects the Supreme Court's longstanding reluctance to "stat[e] a single, precise, all-embracing test for jurisdiction over federal issues embedded in

---

[7]  In suggesting that all legal malpractice claims are "backward-looking," Link Motion misdescribes *Wolfson v. Ernst*, 112 F. Supp. 3d 167 (S.D.N.Y. 2015), as a "legal malpractice claim relating to a federal copyright infringement lawsuit." Br. 18.  But *Wolfson* had nothing to do with legal malpractice.  Instead, the plaintiff there alleged that the defendant—an architect—aided and abetted fraud by submitting false affidavits to the court.  112 F. Supp. 3d at 169.  In any event, unlike here, the question presented in *Wolfson* was purely "hypothetical," as the plaintiff had *prevailed* at trial in the underlying action and simply alleged that, but for the alleged fraud, the court "would have reached that decision *earlier* on a motion for summary judgment," or the underlying plaintiff might not have brought suit at all. *Id.* at 171-72 (emphasis added).

state-law claims." *Grable*, 545 U.S. at 314 (citation omitted); *see also NASDAQ*, 770 F.3d at 1028 ("substantiality must be determined based on a careful, case-by-case judgment"). The "missing" element in *Gunn* is present here, where Link Motion does not ask the state court to examine "hypothetical" federal issues, but instead asks that court effectively to overrule decisions that the district court actually rendered. And the possibility that a state court might render a "contrary" decision on an issue already decided—without any "opportunity for correction by the federal courts"—threatens to undermine the finality of federal decisions and the development of a uniform body of federal law. SPA-23-24 (citation omitted).

Link Motion contends that its malpractice claim "posits a hypothetical" about "what would have happened if the correct legal advice [had] been given" at the outset of the *Baliga* action, whereas the "most" the district court determined in that case was "whether the Receiver Order should be *vacated* in light of the discovery that Baliga lacked derivative standing to assert common law claims and the withdrawal of his derivative claims." Br. 19 (emphasis added). But the "what would have happened" question is hardly hypothetical. The *Baliga* court already held that, regardless of whether Baliga had standing to bring derivative *common-law* claims, he "at least had standing" to bring his derivative *federal* securities claims "at the commencement of this action." 2022 WL 2531535, at *9 (R&R); 2022 WL 3699339, at *1 (adopting R&R in its "entirety"). Because the purported

"hypothetical" was already asked and answered, the malpractice claim would "require a finding that the District Court made the wrong determination on whether it had the authority to grant the preliminary injunction and appoint the receiver." Br. 23; *see also* SPA-22-23.

With respect to costs, Link Motion acknowledges that it seeks to recover "the costs associated with the receivership," but it contends that "[a]n award of such damages will not change the outcome of what happened" in the *Baliga* action. Br. 23. The malpractice claim assumes (counterfactually) that the *Baliga* court would not have appointed the receiver if DLA had argued that Baliga lacked standing. But the district court has already rejected that assertion, holding in the *Baliga* action that "Baliga had standing to bring his derivative securities claims," that "the Court therefore possessed subject matter jurisdiction" to grant a preliminary injunction and appoint the Receiver, and that, because "the Receiver was duly appointed up to October 5, 2020," Link Motion properly bore those costs through that date. 2022 WL 3699339, at *4-5, *6. Thus, if successful, the malpractice claim would "have the 'real-world' practical consequence of reversing" the *Baliga* court's

order "regarding the appropriateness of the receivership and the proper disbursement of costs." SPA-21.[8]

At the end of the day, Link Motion cannot avoid the fact that the malpractice claim asks a state court to overrule numerous *actual* decisions by the federal district court and the court-appointed Receiver. That unique feature of this case supplies the extra "something" that was lacking in *Gunn* and renders the federal issues "substantial."

### C. The District Court's Exercise of Federal Jurisdiction Over the Malpractice Action Does Not Disrupt the Federal-State Balance.

For the same reasons, the district court's exercise of federal jurisdiction in this case does not disrupt the federal-state balance. *See Gunn*, 568 U.S. at 264 (explaining that the Court's balancing analysis in that case "follows from" the substantiality analysis); *see also* SPA-25-26. While removal here was proper in light of the substantial nature of the federal issues raised by *this particular* malpractice action, run-of-the-mill legal malpractice cases (i.e., cases without those unique federal implications) will continue to be litigated in state court. As a result, "there

---

[8] The case Link Motion cites on this issue is distinguishable, as the plaintiff there asserted state-law claims based on whistleblower retaliation that allegedly occurred in the course of *litigating* the underlying action. *Backer v. Cooperatieve Rabobank U.A.*, 338 F. Supp. 3d 222, 227-29 (S.D.N.Y. 2018). Unlike here, those claims did "not involve a direct analysis of the *merits* of" the underlying claims themselves. *Id.* at 237 (emphasis added).

is no reason to believe that the exercise of federal jurisdiction here would open the floodgates to federal courts or otherwise interfere with the normal currents of litigation." *Reserve Mgmt. Co. v. Willkie Farr & Gallagher LLP*, 2012 WL 4378058, at *7 (S.D.N.Y. Sept. 25, 2012);[9] *see also Tantaros*, 12 F.4th at 147 ("exercising federal jurisdiction over this case will not divert many cases from state court"). Conversely, it would do immense violence to the federal-state balance if state courts could effectively overrule *actual* (as opposed to hypothetical) federal-court rulings via a legal malpractice claim and force attorneys by state-court order to bear the costs of a federally appointed receivership, notwithstanding a federal-court order to the contrary.

Tellingly, Link Motion offers no independent analysis of this factor and fails to grapple with the district court's analysis. Instead, it simply quotes *Gunn*'s statements about states' interests in regulating attorney conduct, without *any* argument purporting to balance those interests against the countervailing federal interests. Needless to say, simply *identifying* a purported state interest does not complete the balancing inquiry—especially when the district court specifically held

---

[9] Link Motion contends that *Reserve Management* applied a pre-*Gunn* "definition of what constitutes a substantial federal issue," Br. 23 n.11, but DLA does not cite that case for its analysis of the substantiality factor and did not do so in its brief opposing remand below.

that there are "unique federalism concerns" here that "outweigh" New York's interest in regulating attorneys. SPA-25-26 (discussing forum-shopping concerns).

DLA never argued, and the district court never held, that "state court review of attorney negligence" is categorically barred whenever "the conduct in question concerns representation in a federal action." Br. 24. Rather, removal was proper here because the *specific* federal issues in this *specific* legal malpractice claim are substantial and thus properly heard by the district court.[10]

Link Motion, on the other hand, *would* upset the federal-state balance by categorically barring *all* legal malpractice claims from federal court. Moreover, Link Motion fails to acknowledge its own concession that the district court retained an "interest in supervising Link Motion pending discharge of the Receiver." JA-172. Link Motion suggested that the court should carry out that supervisory role by "placing reasonable limitations on Link Motion's ability to settle or dispose of the legal malpractice claim" in the state-court action, *id.*, an approach the district court correctly concluded "would further *disrupt* the federal-state balance," SPA-25 (emphasis added). Link Motion simply ignores that portion of the court's holding.

---

[10] The Federal Circuit's cursory analysis of this factor, in a patent case that did not even "necessarily raise" any federal issues in the first place, is not to the contrary. *NeuroRepair, Inc. v. Nath Law Grp.*, 781 F.3d 1340, 1344, 1347-48 (Fed. Cir. 2015).

The district court properly exercised federal question jurisdiction over the malpractice claim. This Court should affirm the denial of Link Motion's motion to remand.

## II. Removal Was Also Proper Because the District Court Had Supplemental Jurisdiction.

Although the existence of federal question jurisdiction suffices to support removal, this Court may affirm on the alternative ground that the district court had supplemental jurisdiction under 28 U.S.C. § 1367. This Court held in *Achtman* that supplemental jurisdiction may extend not only to "claims within a single action," but also to "claims within related actions," provided the "two disputes arise from a common nucleus of operative fact"—i.e., either (1) "the facts underlying the federal and state claims substantially overlap[]" or (2) "the federal claim necessarily br[ings] the facts underlying the state claim before the court." 464 F.3d at 335 (citation omitted).

Here, the pending *Baliga* action supports the exercise of supplemental jurisdiction over the state malpractice action under either of these standards. All of the events in dispute in the state malpractice action occurred within the *Baliga* action. The same federal judge presides over both cases and is "well-placed to consider the issues that would arise in the malpractice action," including whether DLA "asserted all appropriate [defenses]," *Achtman*, 464 F.3d at 336, and whether the court would have declined to appoint the Receiver had DLA challenged Baliga's

standing. As in *Achtman*, another malpractice case that evolved from a federal securities action, the district court has "obtained total familiarity with the subject matter of the underlying suit and the professional services of" DLA. 464 F.3d at 336 (cleaned up).

Link Motion's cursory argument on supplemental jurisdiction does not even address *Achtman*, a published opinion from this circuit. Instead, Link Motion relies on two district court cases that stand for the general proposition that § 1367 "does not provide an independent basis for removal." Br. 24-25. Unlike this case and *Achtman*, neither case involved a legal malpractice claim or engaged with the unique jurisdictional questions that an *Achtman*-style case presents. *See Port Auth. of N.Y. & N.J. v. Allianz Ins. Co.*, 443 F. Supp. 2d 548, 555 (S.D.N.Y. 2006) (decided a month before *Achtman*); *Lafayette-Boynton Apartment Corp. v. Lopez*, 2022 WL 2316461, at *3 (S.D.N.Y. June 28, 2022) (erroneously assuming supplemental jurisdiction is limited to "claims that are within the same civil action," without addressing *Achtman*'s contrary holding). Neither governs here.

DLA recognizes that, in most instances, supplemental jurisdiction does not provide a basis for removal. But *Achtman* compels a different result under the circumstances of this case because it held that federal courts may assert supplemental jurisdiction over a state-law action that is sufficiently related to a separate, pending

federal action. 464 F.3d at 335. The near-complete factual overlap between this case and the *Baliga* action supports the exercise of supplemental jurisdiction here.

## III. The Malpractice Claim Is Time-Barred.

Link Motion's legal malpractice claim is governed by a three-year statute of limitations under New York law. N.Y. C.P.L.R. § 214(6). That claim is time-barred because Link Motion did not file suit until more than three years after the last allegedly negligent act DLA took on behalf of Link Motion. JA-32. Link Motion recognizes that the malpractice claim is untimely on its face but attempts to combine various tolling doctrines to extend the limitations period until after it filed the complaint. Br. 3. Each of its arguments lacks merit.

### A. Link Motion's Claim Accrued on January 21, 2019 and Expired on January 21, 2022.

Under New York law, a legal malpractice claim accrues "when the malpractice was committed, not when the client discovered it." *Shumsky*, 750 N.E.2d at 69; *Gurvey v. Cowan, Liebowitz & Latman, P.C.*, 757 F. App'x 62, 64 (2d Cir. 2018) (applying New York law). Here, that was no later than January 21, 2019, when Link Motion agreed not to oppose the preliminary injunction in exchange for additional time to answer Baliga's complaint. JA-32. The complaint contains no allegations of "any alleged malpractice on the part of Defendants after" that date. *Noskov v. Roth*, 2020 WL 4041125, at *4 (S.D.N.Y. July 17, 2020). That DLA moved to withdraw from the representation on March 1, 2019 makes no difference

because "formal termination" does not supply the date on which a malpractice action accrues. *Aaron v. Roemer, Wallens & Mineaux, LLP*, 707 N.Y.S.2d 711, 714 (App. Div. 2000). "What is important is when the malpractice was committed." *McCoy v. Feinman*, 785 N.E.2d 714, 718 (N.Y. 2002).

Link Motion concedes that the alleged malpractice occurred, and the claim therefore accrued, on January 21, 2019. Br. 13. The claim is time-barred because Link Motion did not file it until September 12, 2022—more than three years later.

### B. The "Continuous Representation" Doctrine Does Not Toll the Limitations Period.

Link Motion's argument that the "continuous representation" doctrine tolled the limitations period beyond January 21, 2019 lacks merit. Br. 32. The continuous representation doctrine marks a "limited exception" to the three-year limitations period, *MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, LLP*, 701 F. Supp. 2d 518, 525 (S.D.N.Y. 2010), and requires "clear indicia of an ongoing, continuous, developing and dependent relationship between the client and the attorney," *De Carlo v. Ratner*, 204 F. Supp. 2d 630, 636 (S.D.N.Y. 2002). "The doctrine is predicated on continuing trust and confidence in the relationship between the parties, and therefore it ceases to toll the statute after the relationship of trust and confidence between the client and attorney has ended." *Esposito*, 844 F. App'x at 449.

Significantly, where there has been "a breakdown in that relationship, the doctrine is not applicable." *Anderson v. Greene*, 2016 WL 4367960, at *27

(S.D.N.Y. Aug. 10, 2016).[11] Equally significant, a "client's trust and confidence in her attorney can end before she formally terminates their representation." *Esposito*, 844 F. App'x at 449; *see also Hoffenberg v. Bodell*, 2002 WL 31163871, at *7 (S.D.N.Y. Sept. 30, 2002) (declining to apply continuous representation doctrine where attorney failed to withdraw and proceeded to argue plaintiff's appeal). The key is whether the "end of the relationship of trust" is "evinced by some outward manifestation by either client or attorney." *Esposito*, 844 F. App'x at 449.

Link Motion's own allegations, coupled with the exhibits it attached to its response to DLA's motion to dismiss letter, establish the "erosion" of its relationship with DLA prior to January 21, 2019. JA-28-31 (¶¶ 41, 47, 51), 54-56, 58-59, 62-63. This record reflects that:

- Link Motion "failed to cooperate . . . by [not] respond[ing] to [DLA's] inquiries, thus making the representation unreasonably difficult for DLA to carry out . . . effectively," JA-56, 59;

- DLA told Shi, the chairman of Link Motion's board, on January 19, 2019 that, in light of Link Motion's failure to cooperate, "we . . . assume that we have Link Motion's consent to withdraw from representation," *China AI*, 2023 WL 5016492, at *3 (quoting email incorporated by reference at JA-31 ¶ 51);

- Shi "confirmed" Link Motion's consent to DLA's withdrawal "[o]nly days" after January 21, 2019, JA-62; SPA-41-42; and

---

[11] Link Motion tries to distinguish *Anderson* because it involved accounting. Br. 30. The relevant passages in *Anderson* address "the legal malpractice context" and quote *De Carlo*, a legal malpractice case. 2016 WL 4367960, at *27.

- Link Motion stopped paying DLA's fees *before* the *Baliga* action was filed and declined to retain or pay DLA *afterward*, JA-54-56, 58-59, 62.[12]

These facts constitute "outward manifestation[s]" of the end of any relationship of trust no later than January 21, 2019. *Esposito*, 844 F. App'x at 449.

Link Motion focuses on the wrong question when it argues (at 28-29) that DLA represented Link Motion until the *Baliga* court granted leave to withdraw on March 1, 2019, or that the representation ended on February 4, 2019, when DLA gave Link Motion formal notice of its intent to withdraw, JA-33. Link Motion does not argue that a relationship of confidence and trust with DLA existed after January 21, 2019, yet it insists that the court's granting "leave to withdraw" on March 1 is when the "continuous representation" ended. Br. 32.

New York caselaw rejects this approach, which would upend the relationship-based standard it employs. *See Aaron*, 707 N.Y.S.2d at 714; *De Carlo*, 204 F. Supp. 2d at 636. Link Motion misleadingly quotes *Shumsky* (at 28) to suggest continuous

---

[12]  Communications quoted in the magistrate's report recommending Rule 11 sanctions in *China AI* further confirm the erosion of the relationship by January 21, 2019. Schechtman contacted Shi on January 20, 2019 and warned that the relationship could not continue without payment: "I would like your consent for us to withdraw as your counsel from the litigation if you determine not to pay us to go forward." 2023 WL 5016492, at *3. Schechtman again implored Shi on January 21, 2019 "to please 'respond'" and informed him that "the other option is we also withdraw as Counsel now." *Id.* (cleaned up). Shi responded that Link Motion "fully respected and appreciated her excellent work" but that it would be "very hard" for the company "to make any further payment arrangement." *Id.* (cleaned up).

representation extends through withdrawal. But *Shumsky* simply conducted a fact-specific analysis of when the relationship ended and concluded that, even if a "mutual understanding" about continuing representation existed, the "toll would nonetheless end once the client is informed or otherwise put on notice of the attorney's withdrawal." 750 N.E.2d at 72-73. Here, by contrast, Link Motion's own allegations and exhibits reflect "outward manifestation[s]" that the relationship between Link Motion and DLA had eroded as of January 21, 2019. *Esposito*, 844 F. App'x at 449; JA-54-56, 58-62.

Even if the Court were to accept Link Motion's defective arguments, the continuous representation doctrine does not bring the malpractice claim within the limitations period. Rather, as Link Motion concedes, it would at most extend the claim's lifespan only to March 1, 2022—three years after DLA filed its notice of withdrawal. Because Link Motion did not file this suit until September 12, 2022, it must therefore concatenate the continuous representation doctrine with one or more other tolling doctrines. As explained below, Link Motion's other tolling arguments are meritless.

### C. Executive Order 202.8 Would Not Apply Even If Link Motion Correctly Calculated the Date Its Claim Accrued.

Link Motion next asserts that a New York executive order issued during the COVID-19 pandemic extended its deadline to file by 228 days. Br. 33. This argument rests on a flawed interpretation of Executive Order 202.8 that departs from

the plain meaning of its text. On its face, Executive Order 202.8 merely suspended statutes of limitations that would have expired while the order remained in place and had no effect on limitations periods, like Link Motion's, that expired after the order lifted on November 3, 2020.

Executive Order 202.8, issued in March 2020, served to "temporarily suspend or modify" various deadlines "for the period from the date of this Executive Order through April 19, 2020." 9 N.Y.C.R.R. § 8.202.8. It provided that "any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state . . . is hereby tolled from the date of this executive order until April 19, 2020." *Id.* Additional executive orders continued that "suspension[] and modification[] of law" through November 3, 2020. *Id.* §§ 8.202.67, 8.202.72.

A court interpreting a New York executive order must adhere to its "plain meaning." *Scheja v. Sosa*, 771 N.Y.S.2d 554, 556 (App. Div. 2004). On its face, Executive Order 202.8 indicates that Governor Cuomo intended to "temporarily suspend" statutory deadlines set to expire between "the date of this Executive Order" and November 3, 2020. 9 N.Y.C.R.R. § 8.202.8. New York law distinguishes between a "toll," which pauses the running of the statute of limitations "for a finite time period," and a suspension, which "simply delays expiration of the time period until the end date of the suspension." *Brash v. Richards*, 149 N.Y.S.3d 560, 561

(App. Div. 2021). Here, Governor Cuomo's choice of the word "suspend," coupled with his use of a specific "end date," *id.*, demonstrates an intent to provide relief to litigants whose filing deadlines fell between March 20 and November 3, 2020. Had the governor intended to toll, rather than suspend, state statutes of limitations, he would have paused them for a particular "time period," *id.*—e.g., 30 days.

The governor's use of the modifier "temporarily" before "suspends" reinforces this conclusion. This language is best understood to grant a short-lived reprieve from limitations periods that otherwise would have expired while the executive order remained in effect. Nothing in the text of the order suggests an intent to add 228 days to limitations periods that far outlasted New York's state of emergency. Link Motion's interpretation of the order would give plaintiffs far more than the "temporar[y]" relief Governor Cuomo granted in light of court closures and other pandemic-related delays. *Brash*, 149 N.Y.S.3d at 562.

To the extent that the governor's use of "both the words 'suspend' and 'toll'" creates any ambiguity, *Vasquez v. Tri-State Lumber Ltd.*, 2023 WL 3163164, at *5 (N.Y. Sup. Ct. Apr. 27, 2023), the order's place in a "broader legislative scheme" resolves that ambiguity in DLA's favor, *Kosmider v. Whitney*, 132 N.E.3d 592, 598 (N.Y. 2019). The governor's "authority to modify the statute of limitations" derives from New York Executive Law § 29-a, which empowers him to "'temporarily suspend'" statutes and rules "during a state disaster emergency." *Loeb v. Cnty. of*

*Suffolk*, 2023 WL 4163117, at \*3 (E.D.N.Y. June 23, 2023) (quoting N.Y. Exec. Law § 29-a(1)).  Section 29-a(2) further provides that "any such suspension order shall provide for the *minimum deviation* from the requirements of the statute . . . consistent with the disaster action deemed necessary."  N.Y. Exec. Law 29-a(2)(e) (emphasis added).

Interpreting the executive order to suspend the filing deadline only for claims that would have expired between March 19 and November 3, 2020 would require only the "minimum deviation" envisioned by the legislature.  N.Y. Exec. Law 29-a(2)(e).  By contrast, Link Motion's interpretation would afford plaintiffs a blanket 228-day extension for any claim that had accrued as of March 19, 2020, regardless of whether it was "necessary" to address pandemic-related delays.  *Id.*

Consistent with the plain text, multiple New York cases have recognized that Executive Order 202.8 had no effect on limitations periods that ended after November 3, 2020.  "[T]he executive orders did not extend everyone's statute of limitations period for an additional 228 days."  *Cruz v. Guaba*, 2022 WL 364072, at \*2 (N.Y. Sup. Ct. Feb. 7, 2022).  Rather, the order "merely stopped the running of any applicable period of limitations for the 228 day period of time between March 3, 2020 and November 3, 2020."  *Id.*; *see also Loeb*, 2023 WL 4163117, at \*2 (similar); *Baker*, 161 N.Y.S.3d at 724 (similar); *Barry v. Royal Air Maroc*, 2022 WL 3215050, at \*4 (S.D.N.Y. July 8, 2020) (similar).

Link Motion counters (at 34) that "every case decided by the New York appellate courts" has concluded that Executive Order 202.8 tolled, rather than suspended, statutes of limitations—thus affording Link Motion an additional 228 days to file. But the principal case on which Link Motion relies, *Brash*, involved an appeal deadline that began running on October 2, 2020 and would have expired on November 2, 2020 absent the executive order. 149 N.Y.S.3d at 561-62. That case is thus fully consistent with DLA's position that Executive Order 202.8 paused deadlines that landed during New York's state of emergency in 2020, but went no further.

The same is true of *Roach v. Cornell University*, 172 N.Y.S.3d 215, 218 (App. Div. 2022), where a state court held that the executive order tolled the limitations period for a claim that accrued, and would have expired, while the order remained in place. *Brash* and *Roach* simply did not address whether Executive Order 202.8 enlarged the limitations period for *any* claim that accrued before the order issued and whose limitations period continued long after the order expired. *See Baker*, 161 N.Y.S.3d at 724 ("Plaintiff's counsel misinterprets the *Brash* decision, which explains that the Governor did not toll all statutes of limitation, but only suspended them.").

Link Motion has identified two decisions from intermediate state appellate courts that support its position. But the first, *McLaughlin v. Snowlift, Inc.*, 185

N.Y.S.3d 212, 213-14 (App. Div. 2023), simply cited to *Brash* without any independent analysis. The second, *Murphy v. Harris*, 177 N.Y.S.3d 559, 561 (App. Div. 2022), merely cited to *Brash* and *Roach* and observed that Executive Order 202.8 "used the word 'toll.'" Neither of these decisions "strictly" binds this Court, particularly where their cursory analysis leaves reason to believe the New York Court of Appeals would reach a different conclusion. *City of N.Y. v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 126 (2d Cir. 2010); *see also KLC, Inc. v. Trayner*, 426 F.3d 172, 175-76 (2d Cir. 2005) (recognizing that, where the "state's highest court" has not decided a question of state law, this Court "must carefully predict" how the New York Court of Appeals "would rule").

The trial court decisions cited in Link Motion's brief offer no greater help. These cases either involved limitations periods that expired before November 3, 2020, *see Christian v. Heng Zhang*, 2022 WL 1447046 (N.Y. Sup. Ct. May 6, 2022); cited to authority without analysis, *see Lanza v. Whole Foods Mkt. Grp.*, 2023 WL 128757 (N.Y. Sup. Ct. Jan. 6, 2023); *O'Hara v. Silver*, 2022 WL 17416922 (N.Y. Sup. Ct. Nov. 18, 2022); or recognized that the effect of Executive Order 202.8 is "dispute[d]" among New York courts, *Vasquez*, 2023 WL 3163164, at *5.

In short, Link Motion fails to offer any persuasive explanation for why Governor Cuomo would have intended for his executive order to apply to claims that remained live long after that order expired. "The state of emergency caused by" the

COVID-19 pandemic "no longer existed" at the time Link Motion "was required to commence" its action in early 2022. *Scheja*, 771 N.Y.S.2d at 556. The pandemic "thus could not have interfered with" Link Motion's "ability to meet the statute of limitations." *Id.* Indeed, New York state courts had resumed jury trials as of March 22, 2021 and returned to "full staffing" by May 24, 2021—well over a year before Link Motion initiated this action in New York Supreme Court. *See* N.Y. State Unified Court Sys.: Latest News (Archive), *Full Staffing in All Court Facilities Resumes Statewide* (May 24, 2021), https://tinyurl.com/ynsdnzbz. Executive Order 202.8 therefore did not toll the running of the statutory period for Link Motion to initiate its malpractice action.

Ultimately, however, this Court need not resolve whether Executive Order 202.8 extended Link Motion's filing deadline. Even assuming that the executive order enlarged the limitations period by 228 days, Link Motion's claim expired on September 6, 2022—six days before it filed suit—unless Link Motion can combine the executive order with another tolling mechanism. Because Link Motion's other tolling arguments—continuous representation and equitable estoppel—lack merit, this Court may leave the task of interpreting Executive Order 202.8 for another day.

### D. Equitable Tolling Does Not Salvage Link Motion's Time-Barred Claim.

As a last resort, Link Motion argues that the limitations period was equitably tolled while the Receiver controlled Link Motion. Br. 35. Link Motion asserts that

it faced an "extraordinary . . . obstacle" to timely filing its claim because the "Receiver dominated the Company and prevented the Company from bringing the claim." Br. 36, 39. This theory fails as a matter of law.

New York's equitable tolling doctrine applies to "state law claims" litigated in federal court. *Koral*, 36 F.4th at 409; *see also Achtman*, 464 F.3d at 337 n.4 ("the *Erie* doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law"). But New York "does not toll the running of the statute because of adverse domination or control." *Saylor v. Lindsley*, 302 F. Supp. 1174, 1186-87 (S.D.N.Y. 1969). Adverse domination is, instead, a "federal equitable doctrine" that does not apply to state claims litigated in federal court. *Saylor v. Bastedo*, 100 F.R.D. 44, 50 (S.D.N.Y. 1983). Because New York does not recognize Link Motion's theory of equitable tolling, the company's invocation of this doctrine fails as a matter of law.

Even if adverse domination were a viable theory in New York, Link Motion's argument would fail because New York does not permit plaintiffs to equitably toll a limitations period based on the alleged wrongdoing of a third party—here, the Receiver. To overcome a statute of limitations through equitable tolling, a plaintiff must show either that "the *defendant* conceal[ed] from the plaintiff the fact that he has a cause of action" or "the *defendant* induce[d] him to forego suit." *Koral*, 36 F.4th at 409-10 (emphases added); *see also Abbas v. Dixon*, 480 F.3d 636, 642 (2d

Cir. 2007) ("If a plaintiff cannot articulate any acts *by defendants* that prevented him from timely commencing suit then he has failed to meet his burden of showing that he was wrongfully induced *by defendants* not to commence suit." (emphases added; brackets omitted)); *Roeder v. J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 616 (S.D.N.Y. 2021) (describing equitable tolling as an "extraordinary remedy" requiring "defendant's affirmative wrongdoing"). Link Motion does not allege that Defendants somehow dissuaded or prevented it from filing a malpractice claim, and that failure is fatal to its equitable tolling argument.

Rather than address relevant New York authority, Link Motion relies on inapposite federal cases. *See* Br. 36-38 (citing *Smalls v. Collins*, 10 F.4th 117, 145 (2d Cir. 2021); *Doe v. United States*, 76 F.4th 64 (2d Cir. 2023)). But even if federal law governed here, Link Motion's equitable tolling theory founders on the principle that the federal adverse domination doctrine tolls the statute of limitations only "as to the controlling wrongdoers." *Armstrong v. McAlpin*, 699 F.2d 79, 87 (2d Cir. 1983). Because Link Motion has not asserted any claim against the alleged controlling wrongdoer—the Receiver—the adverse domination doctrine does not apply. *See Sousa v. BP Oil, Inc.*, 1995 WL 842003, at *9-10 (D. Mass. Sept. 12, 1995) (finding the doctrine "inapplicable" except in an action "against a person 'dominating' the corporation"), *aff'd*, 98 F.3d 1357 (1st Cir. 1996).

Link Motion relies on *Meridien International Bank v. Liberia*, 23 F. Supp. 2d 439 (S.D.N.Y. 1998), to support its position that "the doctrine of adverse domination can be invoked against third parties." Br. 39. But there the district court invoked the adverse domination doctrine against *the controlling wrongdoer*. The counterclaim-plaintiffs in *Meridien*—the Liberian government and a related corporation—alleged that the counterclaim-defendant "effectively dominated and controlled" them by bribing their "high officials." *Id.* at 448. Although the counterclaim-defendant was "a third party to the corporation dominated," it was not a third party "to the lawsuit itself." SPA-48 n.10. *Meridien* in no way suggests that Link Motion may resort to the adverse domination doctrine to toll the statute of limitations against a third party like DLA that is not alleged to have dominated or controlled the Receiver or Link Motion.

Link Motion's other arguments for equitable tolling also fail. It argues (at 40) that the district court made improper "findings of fact" when it discounted its own observation that the Receiver could be characterized as "self-interested." But whether the Receiver was "self-interested" is irrelevant because he is not a party here, and his actions cannot justify tolling a claim *against DLA*. No further "fact finding" could resolve that glaring deficiency.

Link Motion's attempt (at 41) to piggyback off the "timely" *China AI* action fares no better. Link Motion forfeited this argument by raising it for the first time

in its motion to reconsider the district court's order dismissing the complaint.  SPA-6; JA-321; *see also Doe v. Trump Corp.*, 6 F.4th 400, 410 (2d Cir. 2021).  Even if the Court could reach this argument, Link Motion does not cite a single authority suggesting that a derivative action by a shareholder—much less one China AI sought to voluntarily dismiss so that Link Motion's counsel could engage in blatant forum-shopping—somehow tolls the limitations period for a direct action by the company.  Instead, Link Motion offers cases that stand only for the general principle that equitable estoppel serves fairness concerns.  Br. 41 (citing *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996); *Warren v. Garvin*, 219 F.3d 111, 113 (2d Cir. 2000)).  Link Motion fails to explain why allowing it to benefit from the filing date of the frivolous *China AI* action would prevent any injustice here.

## IV.    The Court May Affirm Dismissal of the Complaint on the Alternative Ground that Link Motion Has Failed to Plead Causation.

Although the statute of limitations provides a sufficient basis for dismissal, this Court may affirm "on any ground with support in the record, including grounds upon which the district court did not rely."  *Jusino v. Fed'n of Catholic Teachers, Inc.*, 54 F.4th 95, 100 (2d Cir. 2022) (citations omitted).  Here, this Court may affirm on the alternative ground that Link Motion has failed to plausibly allege the causation element of its malpractice claim for two independent reasons.

**A. Link Motion Cannot Show the District Court Would Have Declined to Appoint the Receiver "But For" DLA's Alleged Conduct.**

"In order to prevail in a legal malpractice action under New York law, a plaintiff must establish that . . . but for the attorney's negligence, plaintiff would have been successful in the underlying action." *Carney v. Philippone*, 332 F.3d 163, 167 (2d Cir. 2003) (brackets omitted); *see also Nordwind v. Rowland*, 584 F.3d 420, 434 (2d Cir. 2009) (recognizing that New York applies a more stringent causation standard for malpractice than breach of fiduciary duty). Here, the central premise of Link Motion's malpractice claim is that the *Baliga* court would not have appointed a receiver if DLA had challenged Baliga's standing under Cayman Islands law to assert common-law derivative claims or identified unspecified other "defects" in his federal securities claims. JA-23-27 (¶¶ 20-24, 27-29).

Link Motion cannot establish "but for" causation because the *Baliga* court already considered and rejected the standing argument DLA allegedly should have raised. When Shi asserted this same argument in the *Baliga* action, the court concluded that Baliga's *federal* securities claims conferred standing to seek appointment of the Receiver, regardless of whether he also had standing to bring common-law claims. 2022 WL 2531535, at *9 (R&R); *id.* at *11 n.9 ("even assuming the correctness of [Shi's] proposition, it would ultimately be immaterial to the outcome"); 2022 WL 3699339, at *6 (adopting R&R and holding that "the

Receiver was duly appointed"). Because the *Baliga* court has already concluded that the standing argument DLA allegedly should have raised would not have changed the outcome, Link Motion cannot satisfy the causation element as a matter of law.

Nor has Link Motion ever identified a single "defect" in Baliga's securities claims that DLA purportedly failed to identify—let alone one that, if raised, would have foreclosed the provisional relief the court granted in the *Baliga* action. *See* JA-27. Nor could it, as the *Baliga* court considered and rejected Shi's argument that Baliga failed to adequately plead his federal securities claims. *Baliga v. Link Motion, Inc.*, 2022 WL 16707361, at *2, *5-12, *13-14 (S.D.N.Y. Nov. 4, 2022) (adopting R&R in relevant part); *Baliga v. Link Motion Inc.*, 2022 WL 3363787, at *10-24 (S.D.N.Y. Aug. 10, 2022) (R&R).[13] Link Motion therefore has not shown it "would have prevailed in the underlying action" "but for" DLA's supposed negligence. *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 118 (2d Cir. 2005).

### B. Numerous Intervening Causes Separate DLA's Alleged Conduct from Link Motion's Alleged Harm.

Link Motion also cannot establish causation because its alleged injury derives from multiple intervening causes. Specifically, the causal chain alleged in the

---

[13] Shi advanced this argument in a second motion to dismiss. Although the court, in response to his first motion, found that Baliga had neglected to allege the "purchase or sale of securities," it granted Baliga leave to cure that defect (which he did 10 days later). *Baliga*, 385 F. Supp. 3d at 221, 224; *Baliga*, Dkt. 68. And the court simultaneously rejected Shi's argument that the Receiver should be discharged or the preliminary injunction dissolved. *Baliga*, 385 F. Supp. 3d at 221-23.

complaint relies on the *Baliga* court's discretionary actions and oversight, independent omissions by counsel subsequently hired to defend the *Baliga* action, and asserted misconduct by the Receiver.

**The Baliga *Court***. Contrary to Link Motion's argument that DLA somehow caused the *Baliga* court to appoint the Receiver, DLA merely informed the court that Link Motion would not oppose Baliga's motion for preliminary equitable relief. *Baliga*, Dkts. 22, 23. It was the court that found the requisite necessity and good cause to appoint a receiver. JA-33 (¶ 62); *see also BMO Harris Bank, N.A. v. Principis Cap. LLC*, 2020 WL 8817588, at *2 (S.D.N.Y. Oct. 8, 2020) (decision to appoint receiver within the court's "significant discretion" upon an "adequate showing" of necessity). The court's selection and ongoing independent oversight of the Receiver breaks any causal connection between DLA and Link Motion's alleged harm. *See Schutz v. Kagan Lubic Lepper Finkelstein & Gold LLP*, 552 F. App'x 79, 80 (2d Cir. 2014) (approval of settlement by directors was an "intervening and superseding cause").

**Subsequent Counsel**. "[I]t is well-settled that the introduction of new counsel serves as an intervening cause in a legal malpractice claim, severing the chain of causation . . . so long as new counsel has sufficient opportunity to protect the plaintiffs' rights." *Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*, 2013 WL 3357921, at *6 (S.D.N.Y. July 2, 2013), *aff'd*, 552 Fed. App'x 79, 80 (2d Cir.

2014). Here, any causal nexus between DLA and Link Motion's injury is broken by the inaction of counsel Shi hired to defend the *Baliga* action after DLA withdrew—the same counsel representing Link Motion here. That counsel was informed that Baliga was a Link Motion ADS-holder, and not a registered shareholder, no later than March 29, 2019. *Baliga*, Dkt. 41, at 19. Despite having sufficient opportunity to protect Link Motion's rights—including via a motion to discharge the Receiver that was still being briefed, *Baliga*, Dkts. 35, 37—those lawyers failed to raise the derivative standing argument for more than 19 months, *Baliga*, Dkt. 179, at 1, 6; *Baliga*, Dkt. 183, at 1, 18-19; *see also China AI*, 2023 WL 5016492, at *13 n.8 ("[I]f Baliga's purported lack of standing were such an obvious and meritorious defense as Plaintiff contends, one would have expected Shi's counsel or the company's later counsel to have raised that defense. Neither did.").

Under these circumstances, the proximate cause of any damages sustained by Link Motion was *not* DLA's alleged malpractice, but rather the "intervening and superseding failure of . . . successor attorneys" to assert the supposedly meritorious standing defense. *Pyne v. Block & Assocs.*, 760 N.Y.S.2d 30, 30 (App. Div. 2003); *see also Decker v. Nagel Rice LLC*, 2010 WL 2346608, at *5-6 (S.D.N.Y. May 28, 2010) (dismissing claim where "any alleged malpractice that may have been committed could have been rectified by . . . successor counsel"); *Somma v. Dansker & Aspromonte Assocs.*, 843 N.Y.S.2d 577, 578 (App. Div. 2007) (similar).

57

***The Receiver.*** Link Motion claims, among other things, that its damages resulted from the Receiver's alleged failure to fulfill the company's contractual obligation "to finally transfer ownership of [an] underlying asset out of escrow to the purchaser." JA-35 (¶ 69(c)). Even assuming these allegations are true—and they are not[14]—it was neither a natural nor foreseeable consequence of DLA's limited role in the *Baliga* action that a receiver charged with safeguarding Link Motion's assets would cause the company to forgo "an expected and ascertainable gain of $180 million." *Id.*; *see also Lawsky*, 2015 WL 4470332, at *11 ("The Receiver['s] . . . fiduciary duty is to act in the best interests of the receivership property."); *Adirondack Cap. Mgmt. v. Ruberti, Girvin & Ferlazzo, P.C.*, 842 N.Y.S.2d 603, 608 (App. Div. 2007) (dismissing claim where harm was caused by a third party's "violation of his fiduciary duty to plaintiff," not "any alleged malpractice of defendants"). DLA therefore did not proximately cause those alleged damages as a matter of law.

---

[14] In her report recommending Rule 11 sanctions, the magistrate judge in the *China AI* action surveyed Link Motion's own public statements and securities filings to conclude that these allegations were demonstrably "false." 2023 WL 5016492, at *8-10. For example, Link Motion represented in an SEC filing that it had "completed . . . divestment" of the asset the Receiver supposedly failed to transfer—shares of a company called FL Mobile—before the Receiver was even appointed. *Id.* at *9 (emphasis omitted).

## CONCLUSION

This Court should affirm the district court's judgment denying the motion to remand and granting the motion to dismiss.

Dated:  October 4, 2023                          Respectfully submitted,

_____*/s/ Kevin S. Rosen*_____

Nancy E. Hart                                    Kevin S. Rosen
Peter M. Wade                                    GIBSON, DUNN & CRUTCHER LLP
William J. Moccia                                333 South Grand Avenue
GIBSON, DUNN & CRUTCHER LLP                      Los Angeles, CA 90071
200 Park Avenue                                  (213) 229-7000
New York, NY 10166                               krosen@gibsondunn.com
(212) 351-4000

Katherine Moran Meeks
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue
Washington, DC 20036
(202) 955-8500

*Counsel for Defendants–Appellees*

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the word limitation of Local Rule 32.1(a)(4)(A) because it contains 13,964 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman font.


Dated:  October 4, 2023                                        */s/ Kevin S. Rosen*
                                                      _____