**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

**Docket Number(s):** Case No. 23-944 _____   _____ Caption [use short title]_____

**Motion for:** Supplement the Appendix_____

_____

_____

Set forth below precise, complete statement of relief sought:

Appellant seeks to supplement the appendix to include the

original complaint from a related action and a second

amended complaint as they are essential for a complete

review of existing rulings and will be referenced in the

Appellant's Initial Brief.

Link Motion Inc. v.

DLA Piper LLP (US) and Caryn G. Schechtman

**MOVING PARTY:** Link Motion Inc._____   **OPPOSING PARTY:** DLA Piper LLP (US) and Caryn G. Schechtman

☐ Plaintiff        ☐ Defendant

☑ Appellant/Petitioner    ☐ Appellee/Respondent

**MOVING ATTORNEY:** Michael James Maloney_____   **OPPOSING ATTORNEY:** Peter M. Wade_____
[name of attorney, with firm, address, phone number and e-mail]

Felicello Law P.C.                Gibson, Dunn & Crutcher LLP

366 Madison Avenue 3rd Floor New York, New York 10017    200 Park Avenue, New York, NY 10166

(212) 584-7806 - mmaloney@felicellolaw.com    (434) 284 - 3166 PWade@gibsondunn.com

Court- Judge/ Agency appealed from: Southern District of New York, District Judge Hon. Victor Marrero

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes    ☐ No (explain):_____
_____

Opposing counsel's position on motion:
☐ Unopposed  ☐ Opposed ☑ Don't Know
Does opposing counsel intend to file a response:
☐ Yes    ☐ No  ☑ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has this request for relief been made below?    ☑ Yes ☐ No
Has this relief been previously sought in this court?  ☐ Yes ☑ No
Requested return date and explanation of emergency:  _____
_____
_____
_____
_____

Is oral argument on motion requested?    ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes ☑ No  If yes, enter date:_____

**Signature of Moving Attorney:**

/s/ Michael James Maloney **Date:** 10/25/2023_____    Service by: ☑ CM/ECF    ☐ Other [Attach proof of service]

**Form T-1080** (rev.12-13)

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

Link Motion Inc.,

              Plaintiff-Appellant,          **Case No. 23-944**

      -against-

DLA Piper LLP (US) and Caryn G. Schechtman,

              Defendants-Appellees.

## MOTION TO SUPPLEMENT THE RECORD ON APPEAL

Plaintiff-Appellant Link Motion Inc. ("Appellant"), through undersigned counsel, hereby requests, pursuant to Federal Rule of Appellate Procedure 10(e)(2), that the Court allow supplementation of the record to include a copy of the Complaint and Second Amended Complaint filed in the related action *Baliga v. Link Motion Inc.*, 1:18-cv-11642-VM (the "Baliga Action"), ECF Dkt. 166 in the Baliga Action (together, the "Baliga Pleadings"), which were incorporated into the record below, referenced by the District Court in its December 23, 2022 Decision and Order, referenced by the District Court in its May 26, 2023 Decision and Order, but were not entered on the docket in the district court. The District Court granted leave to supplement the record with a copy of the Baliga Pleadings.

1.    This is an action for legal malpractice.

2.    Appellant alleges that Defendant-Appellees DLA Piper LLP (US) and

Caryn G. Schechtman (the "Appellees") committed legal malpractice during their representation of Appellant in the Baliga Action.

3.     Appellant appeals from:

a. the District Court's December 23, 2022 Decision and Order denying Appellant's motion to remand,

b. the District Court's May 26, 2023 Decision and Order dismissing the action as untimely, and

c. the final Judgment entered on May 26, 2023.

4.     On June 27, 2023, the clerk of the district court transmitted the electronic index to the Clerk of the U.S Court of Appeals for the Second Circuit. Doc.[1] 10-1.

5.     This Court has held that "[s]upplementation of the record on appeal under Rule 10(e) is properly allowed when it will provide this Court with a clearer view of the factors influencing the district court's decision." *Eng v. N.Y. Hosp.*, 98-9646, 1999 U.S. App. LEXIS 25062, at \*2 (2d Cir. Sep. 30, 1999), citing *Fox v. Board of Trustees*, 42 F.3d 135, 143 (2d Cir. 1994).

6.     The Baliga Pleadings from the Baliga Action were originally not entered on the docket before the District Court in this action.

7.     Here, Appellant respectfully submits that supplementation should be

---

[1] All references to "Doc. _" refer to documents filed in this appeal.

granted because the record shows that the District Court considered the Baliga Pleadings when making the rulings contained in the Decisions & Orders that are the subject of this appeal.

8. The electronic index transmitted to the Clerk in this appeal includes the Declaration of Michael James Maloney, dated August 28, 2022 (the "Maloney Declaration").

9. Paragraph 5 of the Maloney Declaration incorporated by reference the Baliga Pleadings, ECF Dkt. 1, 166, Baliga Action, 1:18-cv-11642.

10. In the District Court's December 23, 2022 Decision and Order denying the motion to remand (and which is the subject of this appeal), the District Court referred to the Complaint in the Baliga Action by citation to the ECF Dkt. 1 in the Baliga Action.

11. The Complaint in the Baliga Action was also referenced in the District Court's May 26, 2023 Decision and Order by citation to the ECF Dkt. 1 in the Baliga Action.

12. Based on the District Court's reference to the Baliga Complaint in the Decisions and Orders that are the subject of this appeal, Appellant submits that the District Court considered the Balia Pleadings when making its rulings in the December 23, 2022 Decision and Order and the May 26, 2023 Decision and Order.

13. Appellant contends the foregoing pleadings from the Baliga Action

are necessary for a full review of the rulings and issues that are presented in Appellant's Initial Brief.

14.     On August 16, 2023, the District Court granted a motion by Appellant for leave to supplement the record with a copy of the SAC. *See* Exhibit A annexed hereto.

15.     Copies of the Baliga Pleadings are annexed hereto as Exhibits B and C, respectively.

## CONCLUSION

WHEREFORE, Appellant Link Motion Inc. respectfully requests the Court allow supplementation of the record with the Complaint and Second Amended Complaint in the Baliga Action, identified above, and permit Appellant to supplement the Joint Appendix accordingly.

Respectfully submitted this 25th day of October, 2023.

FELICELLO LAW P.C.

By:   */s/ Michael James Maloney*
        Michael James Maloney
366 Madison Avenue
3rd Floor
New York, New York 10017
Tel. (212) 584-7806
mmaloney@felicellolaw.com
*Counsel for Plaintiff-Appellant*
*Link Motion Inc.*

CERTIFICATE OF COMPLIANCE

Pursuant to Rules 27 and 32 of the Federal Rules of Appellate Procedure, I hereby certify that according to the word count feature of Microsoft Word 365, this document contains 655 words and complies with the typeface requirements and length limits of Rules 27(d) and 32(a)(5)-(6).

 /s/ Michael James Maloney    
Michael James Maloney

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _08/16/2023_

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

LINK MOTION INC.,

                    Plaintiff,

        - against -

DLA PIPER LLP (US) and CARYN G.
SCHECHTMAN,

                    Defendants.

---

**22 Civ. 8313 (VM)**

**ORDER**

**VICTOR MARRERO, United States District Judge.**

    Plaintiff moves the Court to grant its request to supplement the appellate record with the Complaint and Second Amended Complaint filed in the related matter, Baliga v. Link Motion Inc., No. 18 Civ. 11642 (S.D.N.Y.), pursuant to Federal Rule of Appellate Procedure 10(e)(2) ("Rule 10(e)(2)"). (See Dkt. No. 37.) Defendants oppose the request. (See Dkt. No. 38.)

    Rule 10(e)(2) permits modification or supplementation "by the district court before or after the record has been forwarded" "[i]f anything material to either party is omitted from or misstated in the record by error or accident." Fed. R. App. P. 10(e)(2). While the Second Circuit has noted that it would allow supplementation only in "'extraordinary circumstances,'" it is clear that such circumstances relate more specifically to considering "evidence **outside** the record

1

EXHIBIT
A

before the district court." <u>DeBarnardo v. Lowe's Home Centers</u>, 2023 WL 2291882, at *3 (2d Cir. Mar. 1, 2023) (citing <u>Int'l Bus. Machs. Corp. v. Edelstein</u>, 526 F.2d 37, 45 (2d Cir. 1975)) (emphasis added); <u>see also</u> <u>Natofsky v. City of New York</u>, 921 F.3d 337, 344 (2d Cir. 2019) (motion to supplement "is not a device for presenting evidence to this Court ***that was not before the trial judge***" (emphasis added)).

Defendants' opposition is limited to Plaintiff's failure to cite any error or accident in failing to append the Complaint and Second Amended Complaint to the record in this suit. But, in contrast to Defendant's position, courts appear less focused on the existence of an actual error or accident. Rather, the Second Circuit asks whether supplementation would "clarif[y] [its] understanding of the process by which the District Judge reached the decision challenged on appeal." <u>Salinger v. Random House, Inc.</u>, 818 F.2d 252, 253 (2d Cir. 1987) (permitting supplementation where it was "certain that such [documents] were considered" by the district court).

Nothing that Plaintiff seeks to supplement the appellate record with was outside the record before this Court. Plaintiff is correct that the Court referred to and considered both the Complaint and Second Amended Complaint in <u>Baliga</u> in reaching its various decisions in this action. Thus, it

appears in accord with the Second Circuit's view of when supplementation is appropriate.

And while Plaintiff does not admit that any mistake occurred by failing to affirmatively attach the Complaint and Second Amended Complaint to any filings in this action, it is reasonable to find that such failure, given this Court's familiarity with the various cases, was an oversight and thus within the auspices of Rule 10(e). As Defendants do not identify any prejudice that may befall them should the Court allow supplementation, the Court **GRANTS** Plaintiff's request, and directs that the omission of the Complaint and Second Amended Complaint in <u>Baliga v. Link Motion Inc.</u>, 18 Civ. 11642 (S.D.N.Y.) (Dkt. Nos. 1 & 166), be corrected and that the supplemental record including these documents may be certified and forwarded as part of the record on appeal.

**SO ORDERED.**

Dated:    16 August 2023
          New York, New York

_____
          Victor Marrero
          U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WAYNE BALIGA, derivatively on behalf of
LINK MOTION INC. (F/K/A NQ MOBILE INC.)

Plaintiff,

-against-

LINK MOTION INC. (F/K/A NQ MOBILE INC.),
VINCENT WENYONG SHI,
JIA LIAN,
XIAO YU,

Defendants,

-and-

LINK MOTION INC. (F/K/A NQ MOBILE INC.),

Nominal Defendant.

---

1:18-cv-11642

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

Plaintiff Wayne Baliga ("**Mr. Baliga**"), by and through his undersigned attorneys, submits this Verified Shareholder Derivative Complaint against Link Motion Inc. ("**LKM**" or the "**Company**"), Vincent Wenyong Shi ("**Defendant Shi**"), Jia Lian ("**Defendant Lian**"), and Xiao Yu ("**Defendant Yu**") (Defendants Shi, Lian, and Yu together as the "**Individual Defendants**"). Mr. Baliga alleges the following based upon information and belief, except as to those matters concerning Mr. Baliga, which are alleged upon personal knowledge. Mr. Baliga's information and belief is based on, among other things, the investigations conducted by himself and similarly situated shareholders organized under the name LKMForward, such investigations including, among other things, review and analysis of various filings both in the U.S and China, as well as communications with the Company's Board of Directors (the "**Board**") and certain other executives of LKM.

**EXHIBIT
B**

## NATURE OF ACTION

1.      This is a shareholder derivative action brought for the benefit of LKM and its shareholders.  LKM is a multinational technology company that develops, licenses, supports and sells software and services that focus on the smart car and smart ride businesses.  LKM's portfolio of offerings includes enabling technology solutions and secure connected carputers for the ecosystem of car businesses, consumer ride sharing services, as well as legacy mobile security, productivity and other related applications.  LKM operates internationally, is based in Beijing, and trades on the New York Stock Exchange ("**NYSE**") under the ticker "LKM."  LKM has operational offices in various countries including the US.

2.      This derivative action is brought seeking equitable relief and damages to remedy, inter alia, (1) the gross mismanagement of LKM including egregious self-dealing by the Individual Defendants, (2) the misleading and false statements (including material omissions) that the Individual Defendants issued (or failed to issue) to its Board, its shareholders and the investing public, and (3) the now outright fraud and theft of LKM assets by the Individual Defendants over the last few months.

3.      The Individual Defendants are currently stripping the Company of all its value by transferring ownership of LKM's most valuable assets including highly profitable businesses to unknown third parties.  Upon information and belief, the Individual Defendants are going to allow the Company to be delisted from the NYSE and then will "go dark" on LKM's Board and shareholders, leaving LKM and its shareholders with no value or assets and slim chance to recover the same.  This action is an attempt to stop this from happening by, inter alia, getting a receiver appointed to assume control of the Company in order to attempt to claw back LKM's rightful assets, prevent any further fraudulent transfers, and take legal action in China for

the benefit of LKM regarding regaining and protecting their assets.  This action also seeks damages stemming from the Individual Defendants violations of both state and federal law.

**PARTIES**

4.      Plaintiff Wayne Baliga is an individual who is a U.S. citizen and resident of the State of Illinois.  Mr. Baliga is currently and has at all material times of this Action been a shareholder of LKM.

5.      Nominal Defendant LKM is a company incorporated in the Cayman Islands with its principle executive offices located in Beijing, China.  LKM has offices in the United States, but upon information and belief those offices are on the brink of shutting down due to the Individual Defendants cutting support and communication with the US offices.  LKM securities trade on the NYSE under the ticker "LKM."  LKM's agent for service of process in the United States is Law Debenture Corporate Services Inc., 400 Madison Avenue, 4th Floor, New York, New York 10017.

6.      Defendant Shi has been LKM's Chairman of the Board since December 2014 and Chief Operating Officer since October 2005.  Upon information and belief, Defendant Shi is a Chinese citizen.

7.      Defendant Lian is the current acting Chief Executive Officer of LKM.  Upon information and belief, Defendant Lian is a Chinese citizen.

8.      Defendant Yu is a current Director of LKM with managerial and executive influence and power, and who is involved in the highest-level operations of the Company along with Defendant Shi and Lian.  Upon information and belief, Defendant Yu is a Chinese citizen.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. 1332 because the parties are citizens of different states and the amount of controversy exceeds $75,000.00.  Furthermore, this Court has subject matter jurisdiction because Mr. Baliga has alleged violations of federal law.

10.     This Court has jurisdiction over each Defendant named herein because LKM is a corporation that conducts and transacts business in this District, trades on the NYSE, and otherwise has sufficient minimum contacts with the U.S. and this District.  The Individual Defendants through LKM as well as individually also have sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Furthermore, this Court has jurisdiction over each Defendant based on FRCP 4(k)(1) and CPLR 302, due to the Individual Defendants' contacts with this District via LKM and individually.  Moreover, this Court has jurisdiction over all Defendants pursuant to FRCP 4(k)(1)(c) and Section 27 of the Exchange Act (15 U.S.C § 78aa) due to the Exchange Act violations alleged herein.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because each of the Defendants are subject to personal jurisdiction of this District with respect to this action.

12.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

# FACTUAL ALLEGATIONS

## LKM Background

13.    LKM is a multinational technology company that develops, licenses, supports and sells software and services that focus on the smart car and smart ride business. LKM's portfolio of offerings includes enabling technology solutions and secure connected carputers for the ecosystem of car businesses, consumer ride sharing services, as well as legacy mobile security, productivity and other related applications.

14.    LKM was a very successful business with a very significant balance sheet of liquid and current assets when mismanagement and negligence by Defendant Shi and other members of the Board led the Company to be in a position it finds itself today, which includes noncompliance with the NYSE for failing to file current financials, including the annual audited report on Form 20-F for the year 2017 among other listing requirements of which the Company remains today in breach.

15.    Due to various allegations of wrongdoing, there were independent investigations and audits of the Company, which found several potential allegations of conflicts of interest and self-dealings by Defendant Shi. It was then recommended in or around late 2017 that the directors of the board form a special committee and pursue an independent investigation into the matters of dispute between the co-founder Henry Lin and the Chairman of the Board, Defendant Shi. The Company's auditors communicated that they would not be able to complete their audit work for the year 2017 until such a time that the independent investigation was completed. This occurred in August 2018 and was summarized in a press release and 6K by the Company. It became clear based on the findings that Defendant Shi needed to step down from his positions with the Company until the allegations could ultimately be resolved. This was also

communicated by the Company's audit committee chair at the time, who has since resigned, as well as the Company's independent auditor.

16.     Unfortunately, Defendant Shi was unwilling to step down, and, instead, began to direct a campaign of deceit, gross mismanagement, fraudulent self-dealing, and quite literally theft of LKM's most valuable assets.  In their recent rampage to destroy the Company and extract as much value for themselves as possible, the Individual Defendants have breached their fiduciary duties to the Company, the Board, and its shareholders, and have committed various violations of both state and federal law as outlined herein.

**Breaches Due to Mismanagement**

17.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed LKM the fiduciary obligations of good faith, trust, loyalty, and due care, and were required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of the Company so as to benefit the Company and not in furtherance of their personal interests or benefit.

18.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of LKM, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

19.     The Individual Defendants have breached their fiduciary duties by failing to take the necessary steps to prevent the Company's involuntary for-cause delisting from the NYSE.  There are two separate bases for this delisting: (1) the Company has failed to file their annual 2017 Form 20-F as a foreign issuer, and (2) the Company's share price was less than

$1.00 over a consecutive 30 trading-day period as of at least September 24, 2018.  Upon
information and belief, the Company has not taken the necessary steps to conduct an audit and
prepare their 2017 Form 20-F and thus the Company will be imminently delisted from the
NYSE.

20.     The Individual Defendants have breached their fiduciary duties by
directing and/or allowing LKM to abandon certain of its business lines, engaging in gross
mismanagement and wasting of corporate assets.  The Defendants ceased communicating with
LKM's subsidiary in Finland, which has resulted in corporate waste and the closing of the
Finland office on about November 23, 2018.  LKM Finland required both operating capital and
direction from LKM as its largest shareholder to make corporate decisions.  Defendants,
however, simply cut LKM Finland off from any support whatsoever, which brought LKM
Finland to a halt, forcing improper employee layoffs and ultimately the closure of a successful
subsidiary with receivables that exceed debt.  Upon information and belief, LKM may now face
legal action in Finland due to the way LKM Finland was mishandled and how the business was
forced to shut down and lay off employees.

21.     The Individual Defendants have breached their fiduciary duties by
directing and/or allowing LKM to abandon LKM's office and operations in Dallas, Texas, which
is estimated to not have sufficient capital for more than a few weeks of operations.  Similar to the
situation with LKM Finland, the Defendants ceased communications with its US offices, stopped
providing support and capital, and have opted to simply go dark on its US operations and
employees.  Moreover, and similar to the situations with LKM Finland and the US operations,
the Defendants have also ceased operations and communications with several operating entities

in China and even missed employee payroll and other regular operating support during this same time frame.

      22.    In addition to the above breaches of fiduciary duties by the Individual Defendants due to their gross mismanagement of the Company, the Individual Defendants have further breached their fiduciary duties by wrongfully transferring ownership interests of certain LKM assets to unknown third parties, without the consent or knowledge of the Board, shareholders, or the public – these breaches are outlined below.

## FL Mobile and Showself Self-Dealing, Misstatements, and Illegal Transfer

      23.    In or around March 2017, LKM entered into a certain transaction with Tongfang Investment Fund Series SPC ("**Tongfang**") whereby LKM would sell its FL Mobile and Showself Live Social Video Business ("**Showself**") to Tongfang for approximately $507 million dollars.  Press releases announcing the sale to this effect were issued by LKM.  The agreement between LKM and Tongfang called for a small cash payment upfront, after which LKM would transfer Showself to Tongfang, and Tongfang would pay the remaining balance due before May 31, 2017.  The agreement called for FL Mobile and Showself to be transferred back to LKM if Tongfang failed to pay the remaining balance due.

      24.    Unfortunately, Tongfang failed to pay the balance remaining by the due date of May 31, 2017.  After that time, LKM issued multiple press releases every few months explaining that it was extending the due date for Tongfang and that Tongfang was making final preparations to pay the remaining balance due.  Eventually on or around December 14, 2017, LKM issued a press release stating that it was accepting a note from Tongfang in consideration for the remaining balance due under their agreement.  The note was due to be fully paid in one year from the date of issuance.  Tongfang has still not paid down the note.

25.     LKM's statements in their press releases to the investing public regarding the FL Mobile and Showself transaction were materially false and/or misleading because they misinterpreted and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) the extent of the related party transactions involving the transaction between LKM and Tongfang, especially the involvement of ZhongZhi Hi-Tech Investment ("**ZZ**"); (2) due to the related parties involved in the Transaction, most notably ZZ who maintains a significant convertible note with LKM, LKM agreed to consideration in the form of a note with a high likelihood of default because of ZZ's conflicts of interest with Defendant Shi; (3) Defendant Shi's interest in the transaction was not fully disclosed (Defendant Shi it was later discovered was a significant owner of Tongfang who has a junior position to all other purchasing parties, notably ZZ who also has a Director position on LKM's Board and is the note holder); and (4) as a result, Defendants' statements about LKM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

26.     In addition to all of the wrongful behavior outlined above regarding the FL Mobile and Showself transaction, Defendants now have gone even further and appear to have committed and outright theft of FL Mobile and Showself by brazenly transferring the ownership interest of Showself to a completely unrelated third-party entity.  Showself the business (aka Shi Xiang Shi Guang in Chinese) was held by an entity called Shi Xiang Shi Dai.  The ownership of Showself/Shi Xiang Shi Guang was not to be transferred until the note was paid off by Tongfang.  Public Chinese records show, however, that Shi Xiang Shi Guang was transferred from Shi Xiang Shi Dai to an unrelated third-party entity named Shi Xiang Hui Shi on November

27, 2018. It appears now that Tongfang will default on the note, and instead of Showself being transferred back to LKM as per the agreement, Defendants have stolen the valuable Showself business from LKM and strictly for the benefit of themselves.

## SyberOS and Rideshare Illegal Transfers

27. In addition to the fraudulent and illegal transfer of Showself, the Defendants have also recently and brazenly stolen two more of LKM's most valuable assets by transferring two highly valuable assets belonging to LKM to a mysterious third-party. This fraudulent transfer of ownership, like the Showself transfer, is evidenced unambiguously by China's public records.

28. LKM owns a subsidiary called NQ Beijing. NQ Beijing in turn owns Qing Yun Wu Xian. Qing Yun Wu Xian is an investment entity that owns two highly profitable businesses: SyberOS and Link Motion Rideshare ("**Rideshare**").

29. Public Chinese records show that on October 20, 2018, Qing Yun Wu Xian was 100% transferred from NQ Beijing to a mysterious third-party named Zhu Wei.

30. Upon discovering that Qing Yun Wu Xian was transferred to an unknown third-party, the shareholder group LKMForward wrote an email to LKM's Board requesting an explanation. At least two Board members replied to the email indicating that they were unaware that this transfer had taken place.

31. Thus, the Individual Defendants did not gain the necessary approval of the Board for the transfer of Qing Yun Wu Xian, and furthermore, upon information and belief, failed to disclose these material transactions to anyone at the Company or its shareholders, and now two of the Company's most valuable assets, SyberOS and Rideshare, are under the ownership of an unknown third-party.

## Derivative Allegations and Demands to the Board

32.    Mr. Baliga brings this action derivatively in the right and for the benefit of LKM to redress the wrongful and illegal conduct outlined herein by the Individual Defendants.

33.    Mr. Baliga will adequately represent the interests of LKM and its shareholders in enforcing and prosecuting its rights.

34.    LKM is named as a nominal defendant in this action solely in a derivative capacity.  This is not a collusive attempt to confer jurisdiction on this Court that it would not otherwise have.  Prosecution of this action, independent of the Individual Defendants, is in the best interests of LKM and its shareholders.

35.    The group of LKMForward shareholders, including Mr. Baliga, have, on at least three different occasions over the last two months, made demands via formal letters to the Board to remedy the current situation as outlined above and hold the Individual Defendants responsible for their behavior.  Such demands have not been successful.  The Board has either refused or been unable to stop the Individual Defendants from looting the Company.  The Board similarly has not agreed to take legal action against the Company or the Individual Defendants.

### FIRST CAUSE OF ACTION
**(Appointment of a Receiver)**
**(As to Nominal Defendant LKM)**

36.    Mr. Baliga repeats and realleges each of the foregoing allegations as if more fully set forth at length herein.

37.    Due to the wrongful conduct herein, which includes, inter alia, the theft of assets, abandonment of business lines and operations, and failure to properly manage the Company in many material ways, an independent receiver is necessary to (a) prevent the further dissipation of the Company and its assets; (b) take the necessary steps in China to claw back the

assets that were wrongfully transferred out of the ownership of the Company; and (c) manage the Company's operations, prevent the Company from being delisted from the NYSE, and restore value to the Company and its shareholders.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duties)
### (As to the Individual Defendants)

38. Mr. Baliga repeats and realleges each of the foregoing allegations as if more fully set forth at length herein.

39. As outlined herein, the Individual Defendants, due to their positions and control over LKM owed and continue to owe LKM, the Board, and the shareholders certain fiduciary obligations.

40. The Individual Defendants breached their fiduciary obligations in that the Individual Defendants:

    a. failed to disseminate accurate and truthful information to its Board, shareholders, and to the investing public;

    b. failed to get the required Board approval for certain material actions that the Individual Defendants took on behalf of LKM (while at the same time ignoring the recommendations of LKM's legal and financial professionals;

    c. failed to prudently manage the Company in a way that put the best interests of the Company first, including by (i) taking the necessary regulatory steps in the US to ensure the Company stays listed on the NYSE, and (ii) abandoning certain subsidiaries and international offices of the Company which has resulted in corporate waste and potential legal liability of LKM;

    d.    structured the Showself transaction in a way that benefited the Individual

Defendants to the detriment of the Company;

    e.    wrongfully transferred ownership of Showself to an unknown third-party

without the consent or knowledge of the Board or the shareholders;

    f.    wrongfully transferred ownership of SyberOS and Rideshare to an unknown

third-party without the consent or knowledge of the Board of the

shareholders.

    41.    Due to the Individual Defendants' breaches, LKM has been substantially

harmed.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)
### (As to the Individual Defendants)

    42.    Mr. Baliga repeats and realleges each of the foregoing allegations as if

more fully set forth at length herein.

    43.    By their wrongful acts and omissions, the Individual Defendants have

been and continue to be unjustly enriched at the expense of and to the detriment of LKM, and the

circumstances require relief in equity and good conscious.

    44.    The Individual Defendants have gained the benefit of ownership of certain

assets belonging to LKM at the expense of LKM losing said assets.

    45.    Because the Individual Defendants have gained this benefit at the expense

of LKM, equity and good conscious requires that LKM be afforded restitution.

## FOURTH CAUSE OF ACTION

### (Violation of Section 10(b) of The Exchange Act and Rule 10b-5)
### (As to All Defendants)

46. Mr. Baliga repeats and realleges each of the foregoing allegations as if more fully set forth at length herein.

47. The Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the various false statements and omissions outlined herein, which they knew to be false or deliberately disregarded in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48. The Individual Defendants failed to disclose to the Board, its shareholders, or the investing public the various information concerning their wrongful and fraudulent conduct as outlined herein, causing the Company's securities to be artificially inflated and then drop by nearly 50% upon discovery of the misstatements and omissions.

49. The Individual Defendants participated in a scheme to defraud the Company and its shareholders by wrongfully transferring assets out of the Company to unknown third-parties.

## FIFTH CAUSE OF ACTION

### (Violation of Section 20(a) of The Exchange Act)
### (As to All Defendants)

50. Mr. Baliga repeats and realleges each of the foregoing allegations as if more fully set forth at length herein.

51. The Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, the Individual Defendants knew the adverse non-public information regarding the Company's business practices.

52.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

53.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace.

54.     The Individual Defendants did cause the Company to disseminate false information and further failed to disclose the wrongful and fraudulent scheme by the Individual Defendants in transferring assets and value out of the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Wayne Baliga demands that judgment be entered in favor of LKM as follows:

(a) **on the first cause of action (appointing a receiver)**, judgment against Defendants LKM, for the following relief:

  i.     appointing an independent receiver to assume full control over the Company, its assets, and employees;

  ii.    for attorneys' fees and costs; and

  iii.   for such other and further as this Court may deem equitable and just.

(b) **on the second cause of action (breach of fiduciary duties)**, judgment against Defendants Vincent Wenyong Shi, Jia Lian, and Xiao Yu, jointly and severally, for the following relief:

  i.     compensatory damages in an amount to be determined at trial;

Case 1:23-cv-09441 Document 69 10/25/2023 3584449.8 Page 25 of 76

    ii.    consequential damages in an amount to be determined at trial;

    iii.    punitive damages in an amount to be determined at trial;

    iv.    attorneys' fees and costs;

    v.    such other and further relief as this Court may deem equitable and just.

**(c)** **<u>on the third cause of action (unjust enrichment)</u>** judgment against Defendants Vincent Wenyong Shi, Jia Lian, and Xiao Yu, jointly and severally, for the following relief:

    i.    compensatory damages in an amount to be determined at trial;

    ii.    consequential damages in an amount to be determined at trial;

    iii.    attorneys' fees and costs;

    iv.    such other and further relief as this Court may deem equitable and just.

**(d)** **<u>on the fourth course of action (Violation of Section 10(b) of The Exchange Act and Rule 10b-5)</u>**, judgment against Defendants Vincent Wenyong Shi, Jia Lian, and Xiao Yu, jointly and severally, for the following relief:

    i.    compensatory damages in an amount to be determined at trial;

    ii.    consequential damages in an amount to be determined at trial;

    iii.    attorneys' fees and costs;

    iv.    such other and further relief as this Court may deem equitable and just.

**(e)** **<u>on the fifth cause of action (Violation of Section 20(a) of The Exchange Act)</u>**, judgment against Defendants Vincent Wenyong Shi, Jia Lian, and Xiao Yu, jointly and severally, for the following relief:

    i.    compensatory damages in an amount to be determined at trial;

    ii.    consequential damages in an amount to be determined at trial;

    iii.    attorneys' fees and costs;

iv.    such other and further relief as this Court may deem equitable and just.

## **JURY DEMAND**

Plaintiff Wayne Baliga demands a trial by jury on all issues in this action.

Dated:  December 13, 2018
            New York, New York

THE SEIDEN GROUP

Michael D. Cilento, Esq.
469 Seventh Ave., Fifth Floor
New York, New York 10018
(646)-766-1723
mcilento@seidenlegal.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WAYNE BALIGA, derivatively on behalf of
LINK MOTION INC. (F/K/A NQ MOBILE INC.)

                              Plaintiff,
              -against-

LINK MOTION INC. (F/K/A NQ MOBILE INC.),
VINCENT WENYONG SHI,
JIA LIAN,
XIAO YU,

                              Defendants,

              -and-

LINK MOTION INC. (F/K/A NQ MOBILE INC.),

                              Nominal Defendant.

**VERIFICATION**

WAYNE BALIGA, being duly sworn, deposes and says that deponent is the Plaintiff in
this action and has read this Complaint; deponent knows its content and knows that it is true to
the best of deponent's knowledge, except as to those matters stated to be upon information and
belief, and as to those matters, deponent believes them to be true.

_Wayne J. Baliga_
Wayne Baliga

Sworn to me before this 13th day
of December 2018.

_____
Notary Public

OFFICIAL SEAL
PRIYANKA KALRA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 07/20/2020

12/13/18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WAYNE BALIGA,

                        Plaintiff,

       -against-

LINK MOTION INC. (F/K/A NQ MOBILE INC.),
VINCENT WENYONG SHI, ROLAND WU, and
ZEMIN XU,

                     Defendants

1:18-cv-11642-VM-DCF

**JURY TRIAL DEMANDED**

**SECOND AMENDED COMPLAINT**

**EXHIBIT**

**C**

## **TABLE OF CONTENTS**

I.    SUMMARY OF THE ACTION ........................................................................... 1

II.   JURISDICTION AND VENUE ......................................................................... 4

III.  PARTIES .......................................................................................................... 5

IV.  DEFENDANTS' SECURITIES FRAUD ......................................................... 7

    A.  Background To The Fraud ...................................................................... 7

    B.  The Tongfang Transaction ................................................................... 10

    C.  The Truth Emerges ............................................................................... 15

    D.  Post-Transaction Allegations ............................................................... 18

    E.  False And Misleading Statements And Omissions ............................... 21

        1)    Statements And Omissions Concerning The Affiliation Between Tongfang SPC And Tsinghua Tongfang ........................................................................... 21

        2)    Statements And Omissions Concealing Shi's Financial Interest In The Tongfang Transaction.................................................................................... 23

        3)    Statements And Omissions Falsely Assuring Investors That Tongfang SPC Would Pay In Full For FL Mobile And Showself ............................................. 25

    F.  Additional Allegations Of Scienter ...................................................... 29

        1)  Conscious Misbehavior Or Recklessness .................................... 29

        2)  Motive And Opportunity............................................................... 32

    G.  Loss Causation ..................................................................................... 33

    H.  Presumption Of Reliance And Fraud-On-The-Market Doctrine .......... 34

    I.  No Safe Harbor ..................................................................................... 35

    J.  Plaintiff's Purchases Of LKM Securities............................................. 36

V.   DEFENDANTS' MISCONDUCT OCCURING AFTER THE FRAUDULENT SECURITIES TRANSACTION ................................................................................................. 37

   A.   Defendant Shi Robs LKM Of Its Senior Note ................................................................ 37

   B.   Defendant Shi Orchestrates China AI's Purchase Of Class B Shares .............................. 38

VI.   CLAIMS FOR RELIEF .................................................................................................. 40

PRAYER FOR RELIEF ........................................................................................................... 45

JURY DEMAND ..................................................................................................................... 45

Plaintiff Wayne Baliga ("Plaintiff"), a purchaser and holder of American Depository Shares of Link Motion Inc. ("LKM" or the "Company," formerly known as NQ Mobile Inc. ("NQ Mobile")), between January 21, 2014 and January 18, 2019, both dates inclusive (the "Relevant Period"), as alleged below, brings this action against LKM, Vincent Wenyong Shi ("Shi"), Roland Wu ("Wu"), and Zemin Xu ("Xu") (collectively, "Defendants") to recover damages and equitable relief arising out of Defendants' violations of the federal securities laws and state common law.

Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of LKM's corporate filings with Securities and Exchange Commission ("SEC"), various other LKM corporate filings in the U.S., China, and the Cayman Islands, media, analyst, and news reports about the Company, as well as interviews with LKM shareholders. The investigation of facts pertaining to this case is ongoing. Plaintiff believes that additional evidence will support the allegations herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.    This is an action to recover significant investment and corporate losses suffered as a result of a massive, multi-year fraud which led Plaintiff and investors to believe that LKM was engaging in various legitimate hundred-million dollar corporate transactions meant to bolster the Company's capital position and increase shareholder value. These transactions were fraudulent. In reality, these transactions were engineered by Defendant Shi, the Company's Chairman, for the purpose of looting LKM's most valuable assets and lining Defendant Shi's pockets. Defendants' conduct not only harmed investors, like Plaintiff, who relied on Defendants' various misstatements

and omissions concerning the various corporate transactions entered into by LKM, but also harmed the Company which found itself fleeced of its most valuable and revenue-generating assets.

2.      By the end of 2016, LKM was generating hundreds of millions of dollars a year in revenue, in large part because of the success of two of its corporate assets, FL Mobile Jiutian Technology Co., Ltd. ("FL Mobile"), a developer, publisher, and operator of games for mobile phones, and Beijing Showself Technology Co., Ltd. ("Showself"), a mobile social media video platform.  At that time, the Company's American Depository Shares ("ADS") were trading at around $4.00 per share, and the Company had market capitalization in the billions of dollars.

3.      However, during that same time, Defendant Shi found himself in a precarious position.  He was the subject of an internal corporate investigation arising out of his fraudulent ouster of LKM's co-founder, Henry Lin ("Lin"), subjecting Shi to the potential of his being removed from the Company.  Moreover, Shi was also personally liable for millions of dollars in connection with a corporate debt owed by LKM to Zhongzhi Hi-Tech Overseas Investment Ltd. ("Zhongzhi"), an international investment fund and institutional investor in China.  Shi also owed millions of dollars to LKM in connection with a debt the Company held over an entity owned and controlled by Shi.

4.      In order to free himself of this debt, Shi proceeded to exploit the Company and its most valuable assets and engaged in a number of fraudulent and self-dealing transactions from which he benefitted and the Company and its shareholders suffered.  Specifically, Shi used two of LKM's most valuable assets, FL Mobile and Showself, to get himself off the hook.  In March 2017, LKM announced that it had entered into a transaction with Tongfang Investment Fund Series SPC ("Tongfang SPC") by which, for over $500 million, LKM would transfer its equity interests in these assets to Tongfang SPC.

2

5.     However, this transaction (the "Tongfang Transaction") was a fraud.  To make the transaction appear to be a bona fide deal between two legitimate, well-funded parties, Defendants repeatedly represented to investors that LKM was selling its assets to an affiliate of Tsinghua Tongfang, the China-based computing giant worth billions of dollars.  It was not.  Tongfang SPC has no relationship to Tsinghua Tongfang.  In reality, Tongfang SPC is an entity owned and controlled by Shi.  Moreover, Defendants concealed who the real beneficiary of the Tongfang Transaction was.  A day after the transaction was announced, LKM transferred its entire equity stake in FL Mobile and Showself not to Tongfang SPC but to Shi.

6.     Accordingly, Shi engineered this self-dealing transaction such that he could secretly acquire two of the Company's most valuable assets – and do so without any intention of ever paying LKM the full sum owed for these assets.

7.     In February 2018, shortly after the Tongfang Transaction closed, the truth about the transaction was revealed to investors.  As a result, the price of LKM's ADS plummeted over 40 percent, harming Plaintiff.

8.     Defendants' fraud did not stop with the securities fraud arising out of the Tongfang Transaction, and Shi continued to loot the Company of its valuable assets.  In the summer of 2018, with an internal corporate investigation bearing down on him, Shi orchestrated a stock sale by which LKM effectively gave away $10 million of its Class B shares to Shi's associates – an attempt by Shi to retain control of the Company in the event of his ouster.  Then, in the fall of 2018 and without receiving any consideration for the Company or its shareholders, Shi gave away the consideration LKM received in connection with the Tongfang Transaction to Zhongzhi.  As a result, Shi was able to fraudulently clear the debt his own entity owed to LKM and avoid the personal liability he faced as a result of LKM's corporate debt to Zhongzhi.

9.     The revelation of Defendants' fraud has caused Plaintiff significant economic harm.  Plaintiff therefore brings this action under the federal securities laws and under state law to recover the losses suffered and for equitable relief, as set forth herein.

## II.     JURISDICTION AND VENUE

10.     The federal securities claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) ("Exchange Act").

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

13.     This Court has jurisdiction over each defendant.  At all times during the Relevant Period, LKM was a corporation that conducted and transacted business in this District, traded on the New York Stock Exchange ("NYSE"), and otherwise has sufficient minimum contacts with the U.S. and this District.  The Individual Defendants (defined below), through LKM as well as individually, also have sufficient minimum contacts with this District, so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Furthermore, this Court has jurisdiction over each defendant based on FRCP 4(k)(1) and CPLR 302, due to the Individual Defendants' contacts with this District via LKM and individually.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.

15.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telecommunications, and the facilities of the NYSE.

### III.    PARTIES

16.     Plaintiff was a purchaser and owner of LKM securities during the Relevant Period. During the Relevant Period, Plaintiff, as set forth in the accompanying trading records, acquired LKM's ADS at artificially inflated prices and was damaged upon the revelation of the alleged corrective disclosure.

17.     LKM, formerly known as NQ Mobile Inc., is incorporated in the Cayman Islands with its principle executive offices located in Beijing, People's Republic of China ("PRC").  LKM is a multinational technology company that develops, licenses, supports and sells mobile software platforms, including mobile games and social media platforms, as well as services that focus on the smart car and smart ride business.  At all relevant times, LKM securities trade on the NYSE under the ticker "LKM."  Prior to the Company's renaming itself in 2018, at all relevant times, the Company's securities traded on the NYSE under the ticker "NQ."

18.     Defendant Shi is LKM's co-founder.  Beginning in 2014, he became LKM's Chairman of the Board.  In connection with the securities fraud and other fraudulent and tortious conduct alleged herein and pursuant to the authority granted to it by this Court, Robert W. Seiden, the Court-appointed Receiver, acting in the best interest of LKM, removed Shi in March 2019 and has sought to cancel his ability to control or maintain any LKM assets.

19.     Defendant Wu was the Company's Chief Financial Officer since June 2015.  In connection with the Defendants' misconduct as alleged herein, Wu resigned from the Company in September 2018.

20.     Defendant Xu was the Company's Chief Executive Officer since December 2014 and President since December 2010.  In connection with the fraud and other tortious conduct committed by Defendants as alleged herein, Xu resigned from the Company in September 2018.

21.     Defendants Shi, Wu, and Xu are collectively referred to herein as the "Individual Defendants."  Defendants LKM, Shi, Wu and Xu are collectively referred to herein as the "Defendants."

22.     Each of the Individual Defendants:

    a.   directly participated in the management of the Company;

    b.   was directly involved in the day-to-day operations of the Company at the highest levels;

    c.   was privy to confidential proprietary information concerning the Company and its business and operations;

    d.   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    e.   was directly or indirectly involved in the oversight or implementation of the Company's internal controls

    f.   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    g.   approved or ratified these statements in violation of the federal securities laws.

23.     LKM is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency, as all of the wrongful acts complained of herein were carried out within the scope of their employment.

24.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to LKM under *respondeat superior* and agency principles.

## IV.    DEFENDANTS' SECURITIES FRAUD

### A. Background To The Fraud

25.    Prior to the misconduct giving rise to this action, LKM, founded by Defendant Shi and Henry Lin ("Lin"), was a successful China-based provider of mobile internet services with a portfolio of offerings, including platforms for mobile game publishing, mobile advertising, mobile entertainment, and mobile security and productivity applications.

26.    LKM had a significant balance sheet of valuable assets and, prior to the misconduct alleged herein, was generating hundreds of millions of dollars per year in revenue; the Company generated $196.7 million in 2013, $332.3 million in 2014, $406.7 million in 2015, and $343.1 million in 2016.  For the bulk of the Relevant Period, prior to the uncovering of Defendants' securities fraud and Defendants' additional tortious and fraudulent conduct, as alleged herein, LKM's ADS hovered around or over $4.00 per share.  On the final day LKM's ADS was available to be traded on the NYSE, the stock was valued at $0.15, a staggering decline caused by Defendants' ongoing fraud that wiped out billions in shareholder value.

27.    Prior to and during the Relevant Period, two of LKM's most valuable assets were FL Mobile and Showself.  FL Mobile was a developer, publisher, and operator of games for mobile phones, valued in 2017 at approximately RMB 4 billion (approximately $621 million using then-current currency conversion rates).  Showself was a live mobile social media video platform, valued at RMB 1.23 billion in 2017 (approximately $191 million).

28.    FL Mobile and Showself were critical assets to LKM's revenue stream.  In 2016 alone, FL Mobile and Showself generated $175.5 million and $110.7 million respectively for LKM.  In other words, revenues from FL Mobile and Showself accounted for 83 percent of the Company's total 2016 revenue.  In the Company's 2016 annual report, the Company stated that

FL Mobile and Showself "both represent a significant portion of our operations" and that, in the event that the Company divested itself of FL Mobile and Showself, "our revenues and operating results might be greatly reduced."

29.     Prior to March 2017, Shi was a significant shareholder of FL Mobile, having 22 percent equity interest in the LKM asset, which LKM had disclosed to shareholders.

30.     These assets held particular value to the Company as divestment opportunities and mechanisms to unlock shareholder value. As such, between 2015 and 2017, the Company had tried no less than three times to sell FL Mobile on both the Hong Kong and mainland China exchanges. However, these deals failed to come to fruition as a result of expensive and unnecessary administrative delays caused by listing a China-based company on the Hong Kong exchange and significant financial turbulence in the Chinese capital markets in 2016.

31.     Nonetheless, political issues in China and intra-company fighting between LKM's co-founders, Shi and Lin, triggered a series of events that led to Defendants' engaging in the fraud alleged herein. Specifically, led by Xi Jinping, the PRC's then and current President, China began a purported "anti-corruption" campaign directed at powerful individuals, including business and media leaders, in an attempt by the Communist Party to consolidate power and squash dissent.

32.     Lin got swept up into this campaign. In late 2014, Lin was disappeared by the Chinese government. He went missing for months and was uncontactable by his friends, family and associates, including Shi.

33.     Shi saw Lin's disappearance as an opportunity. In December 2014, Shi, seeking to seize control of the Company and insulate it from any further governmental scrutiny it could garner through its association with Lin, engineered Lin's formal resignation as LKM's CEO, with the

Company releasing a press release that Lin resigned due to "personal reasons unrelated to the company."

34.     Upon Lin's purported resignation, Shi became the Company's Chairman of the Board. As the Chairman of the Board, Shi exercised total control of the Company, and no material corporate decision could be taken unless and until he approved them.

35.     A few months later, however, in early 2015, Lin reappeared. Nonetheless, upon his reappearance, Lin maintained his distance from the Company and remained uninvolved with LKM's management and operations. During Lin's absence, Shi took further action against him. In 2016, Shi forged or forced the forgery of Lin's signature on a letter purportedly by Lin announcing his resignation from RPL Holdings Ltd. ("RPL"), one of LKM's larger shareholders.

36.     In response to his removal from RPL, Lin took action. Specifically, Lin raised claims of his improper removal by Shi to the Company's Board of Directors, initiating internal inquiries that escalated into a full-blown internal investigation conducted by LKM's Independent Special Committee of its Board of Directors and carried out by the Company's independent counsel, Loeb & Loeb LLP ("Loeb & Loeb") (and as to the investigation, the "Internal Investigation").

37.     While this investigation was concealed from shareholders at the time, Shi, as LKM's Chairman knew about it. And with the investigation looming over him, Shi knew it was just a matter of time before, as an inevitable result of his actions against Lin, he could possibly be removed from the Company.

38.     Meanwhile, Shi personally found himself under significant financial pressure. In September 2016, Zhongzhi and LKM entered into a Note Purchase Agreement ("Purchase Agreement"), pursuant to which Zhongzhi agreed to purchase a $220 million convertible note

("Convertible Note") from LKM. Also in September 2016, concurrently with the execution of the Purchase Agreement, Zhongzhi, RPL, and Shi entered into a cooperation agreement, by which Shi personally guaranteed to pay to Zhongzhi interest at 10% per annum on the principal balance of Convertible Note prior to its maturity date, plus an additional 2.5% of the balance after the maturity date. In other words, Shi was personally on the hook for millions of dollars.

39. Towards the end of 2016, Shi found himself in a precarious position. He was running out of time before the Internal Investigation caught up to him, and he needed money to pay the Convertible note to Zhongzhi. Notably, both Shi and Zhongzhi have a financial interest in an entity known as Tongfang Investment Fund Series SPC ("Tongfang SPC"). To generate the cash to pay off the Convertible Note, Shi used Tongfang SPC and turned his attention to LKM's most valuable assets, FL Mobile and Showself, engineering their sale in a secretly self-dealing transaction which, when the truth about the deal was revealed and in the words of a financial analyst, "reeked" of fraud.

**B. The Tongfang Transaction**

40. On March 30, 2017, LKM announced that it had entered into a definitive agreement with Tongfang SPC to acquire 63 percent of LKM's equity interest in FL Mobile for RMB 2.52 billion and 65 percent of LKM's equity interest in Showself for RMB 800 million, for a total consideration of RMB 3.32 – approximately $516 million at the time (as to the transaction, the "Tongfang Transaction"). The agreement between LKM and Tongfang SPC called for a nominal upfront payment of RMB 150 million (approximately $23 million), after which LKM would immediately transfer FL Mobile and Showself to Tongfang SPC, with Tongfang SPC required to pay the remaining balance of RMB 3.17 billion by May 31, 2017. The agreement called for FL

Mobile and Showself to be transferred back to LKM if Tongfang SPC failed to pay the remaining balance by May 31, 2017.

41.     The Tongfang Transaction was a fraud perpetrated by Shi to loot the Company of its most valuable assets, effectively handing them over to Shi without fair consideration to shareholders.  To perpetrate the fraud, Defendants made at least three types of materially false and misleading statements, described in further detail below, for the purpose of masquerading the transaction as a legitimate business deal that was free of significant conflicts of interest and fraudulent self-dealing, while omitting critical information concerning the real identity of the buyer and Shi's actual interest in the deal.

42.     <u>First</u>, Defendants falsely and repeatedly represented that the buyer in the Tongfang Transaction, Tongfang SPC, was a corporate affiliate of Tsinghua Tongfang, a bona fide Chinese state-owned computer manufacturing giant based in Beijing with billions of dollars in annual revenue, tens of thousands of employees, and scores of legitimate corporate subsidiaries under its management.  Such an illusion gave the Tongfang Transaction an imprimatur of legitimacy, representing to investors that the transaction was a fair, arms-length negotiation between two aboveboard entities conducted for a legitimate business purpose.  As alleged in further detail below, none of this was true.

43.     From the announcement of the Tongfang Transaction in March 2017 up until its closing in December 2017, Defendants falsely and misleadingly represented that Tongfang SPC was a corporate affiliate of Tsinghua Tongfang.  For example, in a press release dated March 30, 2017 that was attached to a Form 6-K and was signed by Defendant Shi ("March 2017 Press Release"), LKM stated that it "had entered into definitive agreements (the 'Agreements') ***with Tongfang Investment Fund Series SPC (the 'Investor'), an affiliate of Tsinghua Tongfang*.*"

11

44.     Defendants changed tack on their description of how Tongfang SPC was related to Tsinghua Tongfang.  For example, on April 26, 2017, in the Company's 2016 annual report on a Form 20-F that was dated April 25, 2017 and was signed by Defendant Shi (with signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Wu and Xu) ("2016 Annual Report"), the Company stated that "In March 2017, the Group entered into definitive agreements (the 'Agreements') with Tongfang Investment Fund Series SPC (the "Investor"), *an affiliate private equity investment fund of Tsinghua Tongfang*."

45.     Curiously, Defendants changed their description yet again in subsequent press releases.  For example in a November 20, 2017 press release attached to a Form 6-K dated November 21, 2017 and signed by Shi, the Company stated that Tongfang Investment Fund Series SPC was "*an affiliate of Tongfang Securities Limited, a part of Tsinghua Tongfang*,"

46.     These statements were materially false and misleading because, *inter alia*, Tongfang SPC was not an affiliate of Tsinghua Tongfang.  Rather, Tongfang SPC was an investment vehicle of Shi's; Shi exploited the "Tongfang" brand name to convince investors that the valuable Company assets sold to Tongfang SPC were part of a legitimate, arms-length transaction, when in reality they were sold to an entity owned and controlled by Shi himself in a manner that allowed him to get away with acquiring these assets without paying their full price.

47.     Second and related to the above, Defendants made materially false and misleading statements and omissions concerning Shi's actual interest in the Tongfang Transaction, failing to disclose Shi's significant ownership interest in Tongfang SPC and that he would receive an equity interest in both FL Mobile and Showself as a result of the Tongfang Transaction.  Indeed, while previously referencing Shi's existing equity interest in FL Mobile, this was not the complete truth

12

of the matter, as Defendants failed to disclose his true and complete interest in FL Mobile, Showself, and Tongfang SPC.

48.     For example, in the March 30, 2017 Press Release, LKM stated that Shi "***has equity interest in FL Mobile and will continue to participate with the Investor in the future.***"  Likewise, in the Company's 2016 Annual Report, LKM stated that Shi entered into a "***share purchase agreement with FL Mobile and Xinjiang NQ, pursuant to which, Dr. Shi acquired 22% equity interest in FL Mobile by terminating the relevant contractual arrangements and paying Xinjiang NQ a total consideration of RMB880 million.***"

49.     These statements, and the others like them during the Relevant Period, were materially false and misleading because, *inter alia*, Defendants chose to discuss Shi's ownership interest in the Tongfang Transaction without fully and truthfully disclosing that Shi would acquire a significant equity interest in FL Mobile and Showself and that Tongfang SPC was a sham entity owned and controlled by Shi and that was used by Shi to effectuate the transfer of LKM's equity interest in FL Mobile and Showself to himself.

50.     Given the one-sided and fraudulent nature of the Tongfang Transaction, the terms of the transaction were merely pretextual; the "parties" had no plans to execute the agreement under the terms represented to investors.  One day after the Tongfang Transaction was announced, on March 31, 2017 – and eight months before the deal closed and any substantial amount of money was ever paid to LKM – LKM transferred its equity interest in FL Mobile and Showself not to Tongfang SPC but to Shi, as records from the Beijing Enterprise Credit Information Network ("BECIN") demonstrate.  Indeed, after the closing of the transaction, Shi's stake in FL Mobile unexpectedly skyrocketed, shocking investors and financial analysts.  Specifically, one day after

the deal was announced and the purported buyer made an initial down payment pursuant to the terms of the Tongfang Transaction, Shi's stake in FL Mobile jumped from 22 percent to 79 percent.

51. In connection with the Tongfang Transaction, Defendants failed to disclose that Shi would become an equity owner in Showself or that he would be the recipient of LKM's entire equity interest. In fact, the purchase agreement states a portion of the interest to be transferred to Tongfang SPC was to come from Shi's share.

52. Moreover, Tongfang SPC never provided the agreed upon RMB 3.32 billion for the assets. By May 31, 2017, the agreed-upon payment deadline, Tongfang SPC had paid only the nominal sum of RMB 150 million, with the hulking amount of RMB 3.17 billion (approximately $492 million) remaining as a balance. Moreover, Tongfang SPC delayed payment multiple times – in May and November 2017.

53. To assure investors that they had no reason for concern, between the spring of 2017 and December 2017, Defendants made the above-referenced third type of false and misleading statement: statements and omissions representing that Tongfang SPC would pay the remaining balance. For example, in a press release dated May 31, 2017 and filed on a Form 6-K dated June 2, 2017 and signed by Shi ("May 31 Press Release"), the Company stated that "The Company was notified by Tongfang Investment Fund Series SPC … *that additional time is needed for making the payment of the remaining purchase price for the sale of FL Mobile Jiutian Technology Co., Ltd. and Beijing Showself Technology Co., Ltd…. The Purchaser has further communicated its confidence to the Company and is making final preparations for completing the Transactions*. The Company will continue to work with the Purchaser to close the Transactions as soon as possible."

14

54.    Likewise, on August 31, 2017, the Company provided an update on the Tongfang Transaction on its website stating that; "we have received some queries from our investors about the status of the Transaction. *We are working closely with the Purchaser, and doing our best to move the Transaction forward. Currently, the Purchaser still needs additional time to complete the Transaction. However, both the Purchaser and us are confident that this Transaction will be completed soon*."

55.    Then, on November 9 and 20, 2017, the Company announced that it had received payments of RMB 800 million and RMB 400 million, respectively – still a far cry from paying the full balance on the RMB 3.32 billion purchase price. Accordingly, seven months after the payment deadline, Tongfang SPC had paid only a fraction of the purchase price; approximately RMB 1.97 billion remained outstanding – approximately $306 million of $516 million.

56.    Finally, in a press release dated December 14, 2017 that was attached to a Form 6-K dated December 2015, 2017 and was signed by Shi ("December 14, 2017 Press Release), LKM announced the completion of the deal, with Tongfang SPC having purportedly paid in full. Specifically, LKM announced that Tongfang SPC had provided LKM with a nominal payment of RMB 200 million and RMB1.77 billion in the form of a senior note ("Senior Note"). In other words, Tongfang SPC got away with paying less than half of the agreed-upon purchase price in cash: in total it paid only RMB 1.55 billion in cash on a RMB 3.32 billion deal. When Defendants' fraud unraveled in February 2018, as described below, financial analysts were shocked by the size and terms of the Senior Note, stating it was the "tip of the iceberg" of Defendants' fraud.

**C. The Truth Emerges**

57.    Shortly after the completion of the transaction, in February 2018, Defendants' securities fraud was revealed. Specifically, on February 6, 2018, a report entitled "NQ Mobile:

Undisclosed Transfer Of Subsidiaries To Chairman Introduces Significant Risks - Price Target $0" (the "February 2018 Report") was published on *SeekingAlpha.com* that revealed the fraudulent related party transaction concerning Shi's self-dealing role in the deal. As a result of the findings of the February 2018 Report, financial analysts "doubt[ed] every aspect of the transaction."

58. <u>First</u>, contrary to Defendants' representations, the February 2018 Report revealed that Shi was fraudulently on both sides of the Tongfang Transaction. Citing financial records from BECIN dated March 31, 2017 – one day after the announcement of the Tongfang Transaction – the February 2018 Report revealed that the Company transferred all of its equity interests in FL Mobile and Showself **not to Tongfang SPC but to Shi himself**. The February 2018 Report also noted that nowhere in the Company's disclosures about the Tongfang Transaction did the Company ever represent that Shi would ever own any equity interest in Showself or receive LKM's entire equity interest in these assets.

59. <u>Second</u>, the February 2018 Report revealed the falsity of Defendants' representations concerning the purported affiliation between Tongfang SPC and Tsinghua Tongfang. Indeed, the February 2018 Report stated that, while according to the Company's prior press releases, Tongfang SPC was an affiliate of Tsinghua Tongfang, Shi fraudulently exploited the use of the "Tongfang" name to give the deal the appearance of an arm's length transaction with a well-funded, established, and legitimate third party.

60. For example, the February 2018 Report demonstrated that, at the time of the Tongfang Transaction, LKM and Tongfang SPC had the exact same corporate address in the Cayman Islands. Moreover, the February 2018 Report stated that Tongfang SPC unexpectedly dissolved itself in July 2017 and reincorporated itself with a new address in August 2017, just one day before it delayed its payments to LKM.

16

61.     Additionally, the February 2018 Report highlighted Defendants' changed verbiage during the Relevant Period for the purported affiliation between Tongfang SPC and Tsinghua Tongfang, providing further evidence that this supposed "affiliation" was a fiction. Specifically, Defendants stated that Tongfang SPC was an affiliate of Tsinghua Tongfang, while later press releases claimed that Tongfang SPC was an affiliate of Tongfang Securities Limited, a part of Tsinghua Tongfang.

62.     The February 2018 Report demonstrated that these representations were false and misleading. At the time of the February 2018 Report, Tongfang Securities was wholly owned by Neo-Neon, a publicly traded company in Hong Kong, which in turn was 64 percent owned by Tsinghua Tongfang. However, neither Neo-Neon's nor Tsingua Tongfang's publicly-available financial records report any interest in or relationship to Tongfang SPC. And relatedly, with Neo-Neon reporting a book value of only $230 million, it would be implausible that if Tongfang SPC, a purported wholly-owned subsidiary of Neo-Neon, entered into an agreement worth over $500 million, Neo-Neon would not report it. And furthermore, as a bottom-line issue, neither Neo-Neon nor Tongfang Securities had the financial capability to support the Tongfang Transaction, with the former having only $87 million in cash in June 2017.

63.     Additionally, the February 2018 Report demonstrated the sham affiliation between Tongfang SPC and Tsinghua Tongfang because, even after the transfer of assets, Shi remained the legal representative of FL Mobile. As a general rule, every business in China is required to have a legal representative who is the principal of the company and is the employee with the legal power to represent and enter into binding obligations on behalf of the company. If Tongfang SPC were an independent party – or affiliated with Tsinghua Tongfang – Tongfang SPC would have installed

17

a new legal representative for FL Mobile; the Chairman of the seller would not remain the legal representative for an asset owned by the new buyer.

64.     Furthermore, the amount and terms of the Senior Note, described above, suggest both that there was no affiliation between Tongfang SPC and Tsinghua Tongfang and that Shi controlled Tongfang SPC.  Indeed, LKM never received payment from Tongfang under the Senior Note.  Accordingly, Shi was able to secure these assets for himself without paying the balance of RMB 1.77 billion – approximately $275 million.

65.     Plaintiff's Counsel's investigation into this matter has corroborated the fact that Tongfang SPC is an entity owned and controlled by Shi.  Indeed, at the time of the Tongfang Transaction, Shi was Tongfang SPC's majority stakeholder and had final decision-making authority over the operations and management Tongfang SPC.

66.     Moreover, upon information and belief, the payments made by Tongfang SPC to LKM in connection with the Tongfang Transaction were a sham, meant to convince investors that the transaction was legitimate and to conceal Shi's self-dealing.  By the closing of the Tongfang Transaction, LKM had paid Zhongzhi approximately $88 million under the Convertible Note.  Upon information and belief, Zhongzhi transferred that money to Tongfang SPC, and Tongfang SPC then transferred that money back to LKM.  This circuitous payment trail made it appear that Tongfang SPC was paying LKM for FL Mobile and Showself.  Instead, these payments amounted to a round-trip deal; Shi used LKM's funds to acquire LKM's assets.

**D.  Post-Transaction Allegations**

67.     The fallout of the fraud was severe, and, between February 2018 and January 2019, LKM experienced a series of setbacks leading ultimately to the Company's being delisted from the NYSE.

68.     In response to the February 2018 Report, Shi quickly went on the defensive, issuing a press release that falsely and misleadingly attempted to explain the self-dealing transaction. Specifically, Shi maintained that "all material aspects of the FL Mobile divestment and the sale of Beijing Showself's live social video businesses were publicly disclosed, including my participation and role in the purchasing group." Shi also denied his connection to Tongfang SPC, maintaining that it was an "independent third party." And as to why LKM's assets were transferred to him, Shi's answer was not true: "the purchasing group requested that the shares should be registered under a new individual shareholder to satisfy structural arrangements related to future capital market requirements of the divested assets. The arrangements are made to ensure the successful completion of the transaction." Shi acquired FL Mobile and Showself not so he could "satisfy structural arrangements" but rather because his goal was to personally acquire them.

69.     Then on May 1, 2018, LKM filed with the SEC a notification of its inability to timely file its Form 20-F for 2017. On May 15, 2018, LKM explained that delay was a result of improper financial reporting, such that the Company's financial statements from the second quarter of 2016 through the fourth quarter of 2017 could no longer be relied upon and were inaccurate. The Company admitted significant failures to disclose transactions, including Shi's payment for his pre-Tongfang Transaction equity interest in FL Mobile.

70.     Things got worse for the Company, as LKM's former Chairman, Lin, during the first half of 2018 raised a host of new allegations against Shi in connection with Shi's forcing his resignation. In response, in May 2018, the Company publicized that it was conducting the Internal Investigation and that the Board of Directors had brought in Loeb & Loeb to lead the investigation.

71.     A few months later, in September 2019, LKM made public Loeb & Loeb's searing findings. Loeb & Loeb's investigation found that Shi had fraudulently induced Lin's resignation

from LKM's subsidiary RPL by forging or causing the forgery of Lin's signature. Moreover, Loeb & Loeb also found that the Company's justification for Lin's resignation from the Company in 2014 was false and misleading; he did not resign for "personal reasons" but as a result of the "Chinese government investigation involving matters unrelated to the Company" – the purported anti-corruption campaign into which Lin got swept up. And additionally, Loeb & Loeb also determined that the Company's internal controls were ineffective and required remediation, stating that "the Company's internal procedures and processes with respect to its decision making and operations should be made more effective and transparent in order to avoid events in the future that could lead to allegations similar to those that have been investigated by the Special Committee."

72.     Then, on September 24, 2018, the Company announced that, pursuant to NYSE rules, the Company was no longer in compliance with NYSE listing standards, as the standard required a 30-day average closing share price to remain at or above $1.00 – which LKM's ADS was not.

73.     It never would again. On December 24, 2018, LKM announced that NYSE had determined that the Company was no longer suitable for listing because of "abnormally low" price levels and that NYSE would apply to the SEC to delist the Company's ADS from its exchange. Shortly thereafter, the SEC delisted LKM.

74.     Key resignations quickly followed suit. On December 19, 2018, the Company announced that Larry Chi, LKM's then Co-Chairman, had resigned from the Company's board of directors due to "personal reasons." Then, on January 11, 2019, the Company announced that its independent registered public accounting firm, Marcum Bernstein & Pinchuk LLP ("MBP") had resigned. In its resignation letter, MBP cited as reasons for its resignation the significant

misrepresentations and omissions of financial reporting in the Company's financial statements for 2016 and 2017 and the allegations against Shi raised by Lin that were the subject of the Internal Investigation, demonstrating troubling corporate governance issues within the Company – suggesting that MBP could no longer "rely on the representations of management."

75.     A few months later, Shi was out.  On February 1, 2019, the Court appointed the Receiver to, among other things, manage the Company's operations and protect its assets from further waste and theft.  On March 14, 2019, the Receiver, pursuant to the authority granted to him by this Court and acting in the best interest of the Company, removed Shi as Chairman and Chief Executive Officer.

### E.  False And Misleading Statements And Omissions

76.     During the Relevant Period, Defendants made materially false and misleading statements and omissions concerning the Tongfang Transaction.  Defendants' actionable misstatements can be classified into four categories: (i) statements and omissions concerning the purported affiliation between Tongfang SPC and Tsingua Tongfang; (ii) statements and omissions concealing Shi's financial interest in the Tongfang Transaction; (iii) statements and omissions meant to assure investors that Tongfang SPC would pay in full for FL Mobile and Showself; and (iv) statements and omissions concerning the efficacy of the Company's internal controls.  These misstatements and omissions are alleged in detail below.

### 1)  Statements And Omissions Concerning The Affiliation Between Tongfang SPC And Tsinghua Tongfang

77.     In order for Shi to ensure that the Tongfang Transaction would close and that he would fraudulently be able to get away with selling to himself two of the Company's most valuable assets, Defendants needed to masquerade the Tongfang Transaction as a bona fide, arms-length deal with a well-funded and legitimate counterparty.  Accordingly, Defendants capitalized on the

"Tongfang" name and represented to investors that the buyer was an affiliate of the PRC-based computer giant Tsinghua Tongfang.

78.　　In a press release dated March 30, 2017 and attached to a Form 6-K signed by Defendant Shi and dated March 31, 2017 ("March 30, 2017 Press Release"), LKM stated that it "had entered into definitive agreements (the 'Agreements') *with Tongfang Investment Fund Series SPC (the 'Investor'), an affiliate of Tsinghua Tongfang*."

79.　　The Company made a substantively identical misstatement in a press release dated April 6, 2017 that was attached to a Form 6-K dated April 7, 2017 and was signed by Defendant Shi.

80.　　Defendants made similar misstatements later in the Relevant Period. For example, in the Company's 2016 Annual Report attached to a Form 20-F that was dated April 25, 2017 and signed by Shi ("2016 Annual Report"), the Company stated that it had sold its "remaining 63% equity interests in FL Mobile *to an affiliate private equity investment fund of Tsinghua Tongfang* in March 2017."

81.　　In a press release dated November 9, 2017 and attached to a Form 6-K dated November 13, 2017 and signed by Defendant Shi ("November 9, 2017 Press Release"), LKM stated that Tongfang SPC was "*an affiliate of Tongfang Securities Limited, a part of Tsinghua Tongfang*."

82.　　Defendants made substantively identical misstatements in a press release that was dated November 20, 2017 and attached to a Form 6-K dated November 21, 2017 and signed by Defendant Shi, as well as in a press release dated December 14, 2017 that was attached to a Form 6-K dated December 15, 2017 and signed by Defendant Shi.

83. These statements and omissions were materially false and misleading. Tongfang SPC was not "an affiliate of Tsinghua Tongfang," an "affiliate private equity investment of Tsinghua Tongfang," or and "affiliate of Tongfang Securities Limited" – which itself was not a "part of Tsinghua Tongfang." To the contrary, Tongfang SPC had no formal or informal affiliation with any of these entities but rather was an entity that was owned and controlled by Shi and which fraudulently exploited the "Tongfang" name to give the deal the appearance of an arm's length transaction with a well-funded third party, as demonstrated by the fact that: (i) at the time of the Tongfang Transaction, LKM and Tongfang SPC had the exact same corporate address in the Cayman Islands; (ii) in July 2017, Tongfang SPC unexpectedly dissolved itself and reincorporated with a new address in August 2017, just one day before it delayed its payments to LKM for a second time; (iii) both Neo-Neon and Tsinghua Tongfang, Tongfang Securities' parent entities, report no financial interest in or relationship to Tongfang SPC or even mention Tongfang SPC; (iv) neither Neo-Neon nor Tongfang Securities had the financial capability to take part in the Tongfang Transaction, with both entities having nowhere near the cash to pay for FL Mobile and Showself; (v) Shi remained the legal representative of FL Mobile after the close of the transaction, contrary to what would have ensued if Tsinghua Tongfang or an independent Tongfang SPC purchased FL Mobile; and (vi) the terms of the Senior Note were so one-sided and beneficial to Tongfang SPC that LKM never would have accepted the Senior Note as consideration had Shi not been on both sides of the deal.

**2) Statements And Omissions Concealing Shi's Financial Interest In The Tongfang Transaction**

84. Throughout the Relevant Period, Defendants also made materially false and misleading statements and omissions concerning Shi's financial interest in the Tongfang

Transaction, concealing the material fact that LKM's equity interest in FL Mobile and Showself would go to Shi and not Tongfang SPC.

85.    In the March 30, 2017 Press Release, the Company stated that Shi "**has equity interest in FL Mobile and will continue to participate with [Tongfang SPC] in the future.**"

86.    In the Company's 2016 Annual Report, LKM stated that Shi entered into a "**share purchase agreement with FL Mobile and Xinjiang NQ, pursuant to which, Dr. Shi acquired 22% equity interest in FL Mobile** by terminating the relevant contractual arrangements and paying Xinjiang NQ a total consideration of RMB880 million."

87.    And in the Company's 2016 Annual Report, concerning the divestiture of FL Mobile and Showself, the Company stated, "**We have transferred our equity interests in FL Mobile and Showself (Beijing) to [Tongfang SPC]** … and are in the process to collect remaining purchase price and close the whole FL Mobile and Showself (Beijing) Divestment."

88.    These statements and omissions were false and misleading because in the context of the Tongfang Transaction, by discussing Shi's financial interest in FL Mobile and to what entity FL Mobile and Showself would be transferred, Defendants had a duty to disclose the full truth about Shi's actual and material financial interest in FL Mobile, Showself, and the Tongfang Transaction.  Indeed, these statements and omissions conceal the fact that LKM transferred FL Mobile and Showself not to Tongfang SPC but to Shi.  Moreover, in discussing Shi's ownership of FL Mobile, Defendants had a duty to disclose but concealed the fact that Shi would become an equity owner of Showself.  And furthermore, these statements and omissions gave the impression to investors that, in connection with the Tongfang Transaction, Shi would not acquire additional equity in FL Mobile, equity in Showself, or that he was on both sides of the transaction.

**3) Statements And Omissions Falsely Assuring Investors That Tongfang SPC Would Pay In Full For FL Mobile And Showself**

89. After Tongfang failed to make the full RMB 3.32 billion payment by May 31, 2017 under the terms of the Tongfang Transaction, Defendants made materially false and misleading statements and omissions meant to assure investors that LKM would receive full payment for its divestment of FL Mobile and Showself.

90. In a press release dated May 31, 2017 and filed on a Form 6-K dated June 2, 2017 and signed by Shi ("May 31 Press Release"), the Company stated that it "was notified by Tongfang Investment Fund Series SPC … *that additional time is needed for making the payment of the remaining purchase price for the sale of FL Mobile Jiutian Technology Co., Ltd. and Beijing Showself Technology Co., Ltd…. The Purchaser has further communicated its confidence to the Company and is making final preparations for completing the Transactions*. The Company will continue to work with the Purchaser to close the Transactions as soon as possible."

91. On August 31, 2017, the Company provided an update on the Tongfang Transaction on its website stating that "we have received some queries from our investors about the status of the Transaction. *We are working closely with the Purchaser, and doing our best to move the Transaction forward. Currently, the Purchaser still needs additional time to complete the Transaction. However, both the Purchaser and us are confident that this Transaction will be completed soon*."

92. In a press release dated November 9 and attached to a Form 6-K dated November 13, 2017 and signed by Shi, the Company stated that Tongfang SPC "*remains committed to completing the entire divestments … being all of the equity interests beneficially owned by the Company … [in FL Mobile and Showself].*"

25

93.     In a press release dated December 14, 2017 and attached to a Form 6-K dated December 15, 2017 and signed by Shi, the Company, having purportedly completed the Tongfang Transaction by receiving the Senior Note from Tongfang SPC stated that "***it has completed the FL Mobile Divestment and the Sale of Showself's Live Social Video Business***" because LKM had received the "***RMB1,770 million in a senior note from [Tongfang SPC].***  This brings the total consideration received to approximately RMB3.32 billion, or 100% of the agreed upon price pursuant to the definitive agreements between the Company and the Investor in March 2017. ***As compensation to the Company, the senior note issued to the Company bears an interest of 8% per annum. This one-year senior note may be extended by another 12 months at the Company's option, and can be redeemed early by [LKM] for principle plus accrued interest to the Company at any time.***"

94.     These statements and omissions were materially false and misleading.  LKM, as controlled by Shi, knew that Tongfang SPC, also controlled by Shi, had no intent on paying for FL Mobile and Showself in full; Tongfang SPC was certainly not committed to completing the transaction under the agreed-upon terms.  Moreover, with Shi effectively lending himself money in the form of the Senior Note, he had no interest in redeeming that debt on behalf of LKM.

**4)  Statements And Omissions Concealing The Efficacy Of LKM'S Internal Controls**

95.     Throughout the Relevant Period, Defendants also made materially false and misleading statements and omissions concerning the Company's internal controls.  Specifically, in the Company's 2016 Annual Report, Defendants Xu and Wu, signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the Company's financial statements and the efficacy of its internal controls.

96. In their respective Section 302 SOX certifications, Defendants Xu and Wu stated the following:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

And that:

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

And specifically as to the Company's internal controls, Defendants Xu and Wu certified that they:

(a) *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, *to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

(c) *Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures*, as of the end of the period covered by this report based on such evaluation; and

(d) *Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by this annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting*;

27

97.    In the Section 302 Certifications, Defendants Xu and Wu further certified that:

The Company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent function):

(a)    ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information***; ***and***

(b)    ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.***

98.    Likewise, in the Company's 2016 Annual Report, Defendants Xu and Wu, pursuant to their Section 906 Certifications of SOX stated that:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

99.    These statements made in the SOX 302 and 906 Certifications were materially false and misleading.  LKM's internal controls were riddled with material weaknesses and were woefully ineffective because: (i) the Company permitted, assisted, furthered and aided the self-dealing and fraudulent Tongfang Transaction to go forward and close; (ii) failed to report the transaction as a self-dealing and fraudulent related party transaction, as it was required to do under the federal securities laws; and (iii) failed to remediate its internal controls or correct the financial statements that reported the Tongfang Transaction to state that Shi received the Company's equity interest in FL Mobile and Showself and/or that Shi was an owner of Tongfang SPC.

100.     Indeed, based in part on the findings of the Internal Investigation, the Company admitted that, at the time of the Tongfang Transaction, "the Company's internal procedures and processes with respect to its decision making and operations should be made more effective and transparent in order to avoid events in the future that could lead to allegations similar to those that have been investigated by the Special Committee."  Moreover, in connection with the Company's notification of its delayed filing of its 2017 20-F, the Company admitted that its financial statements from the second of 2016 through the fourth quarter of 2016 – and all of 2017 – were inaccurate and could not be relied upon.

### F.  Additional Allegations Of Scienter

101.     Together with the above-alleged facts, each of the Defendants acted with scienter in that each knew or recklessly disregarded the true facts in making the materially false and misleading statements and omissions identified herein.

#### 1)  Conscious Misbehavior Or Recklessness

102.     Given that LKM and Shi engineered the Tongfang Transaction to intentionally and secretly transfer FL Mobile and Showself directly to Shi, it is implausible to conclude that LKM and Shi did not know, or at minimum were reckless in not knowing, that the alleged misstatements were false or misleading when made.  Indeed, the very self-dealing nature of the Tongfang Transaction underscores their scienter.  Shi, the Chairman and COO of LKM, an entity he controlled, intentionally orchestrated a sham transaction to Tongfang SPC, an entity he owned and controlled, for his own benefit – and LKM, on the very day after the deal was announced, transferred FL Mobile and Showself to Shi, as opposed to Tongfang SPC.

103.     Defendants' scienter is also demonstrated by the fact that, during the Relevant Period, FL Mobile and Showself were critical assets to the Company which generated the bulk of

the Company's annual revenues. In 2016, FL Mobile and Showself collectively generated $286.2 million for LKM – 83 percent of the Company's total 2016 revenue. FL Mobile and Showself had been valued at approximately $621 million and $191 million, respectively. And moreover, the Company admitted that the divesting of these assets would greatly reduce the Company's revenues and operating results. Accordingly, Defendants were paying close attention to FL Mobile and Showself.

104. A strong inference of Defendants' scienter is also demonstrated by the fact that the Tongfang Transaction was not the first time that LKM and Shi had made fraudulent transfers of the Company's assets to an otherwise unannounced party or engage in other forms of corporate fraud for his benefit.

105. Indeed, upon information and belief, Defendants stole two additional LKM assets by transferring these assets to a mysterious third-party, as demonstrated by China's public records. By way of background, at all relevant times, LKM owns a subsidiary NQ Beijing, which in turn owns Qing Yun Wu Xian, which is an investment entity that owns two highly profitable businesses: SyberOS and Link Motion Rideshare ("Rideshare").

106. Public Chinese financial records show that on October 20, 2018, NQ Mobile transferred 100 percent of its interest in Qing Yun Wu Xian to a mysterious third-party named Zhu Wei. Upon discovering that Qing Yun Wu Xian was transferred to this unknown third-party, LKMForward, a LKM shareholder group, wrote an email to LKM's board of directors requesting an explanation. The responses from LKM's board indicated that it was unaware that this transfer had taken place. Upon information and belief, Defendants failed to disclose these material transactions to its shareholders for the purpose of raiding the Company of its valuable assets.

107.     Shi engaged in other fraudulent and self-dealing transactions meant to rob LKM of its assets and to benefit him personally.  As alleged above, Zhongzhi, the entity to which LKM owed the Convertible Note, was involved in these transactions.  During the Relevant Period, both Shi and Zhongzhi had an interest in Tongfang SPC.  And notably, after the Tongfang Transaction closed, Tongfang SPC owed LKM money in connection with the RMB 1.77 billion Senior Note. In other words, and undisclosed to investors at the time, Shi and Zhongzhi, through Tongfang SPC, owed LKM money.  Moreover, in the fall of 2018, months after the purported closing of the Tongfang Transaction, Shi found himself personally liable for millions of dollars of interest based on an existing $132 million balance on the Convertible Note that LKM owed to Zhongzhi.  With payment coming due under the Convertible Note in October 2018, Shi was running out of time. So, in mid-September 2018, Shi gave LKM's RMB 1.77 billion Senior Note to Zhongzhi.  In exchange, LKM received nothing.  In effect, it was a bribe to ensure that Zhongzhi would not force LKM into default.  And in so doing, Shi killed two birds with one stone: he saved himself million dollars by not having to pay the personally-guaranteed interest on the Convertible Note, and, by giving away the Senior Note, Shi ensured that Tongfang SPC (and accordingly he and Zhongzhi) would not have to pay LKM.  The facts related to this fraudulent transaction, referred to as the "Pledge Transaction," are specifically alleged below.

108.     Likewise, during Shi's absence, Shi engineered the "resignation" of Lin twice, once from LKM and once from RPL, and went so far as to forge Lin's signature to effectuate the purported resignation.

109.     A strong inference of Defendants' scienter is also demonstrated by the fact that shortly after Shi engineered the fraudulent and self-dealing Pledge Transaction, Defendants Xu and Wu resigned.

110.   Likewise, a strong inference of Shi's scienter is supported by the fact that the Receiver removed Shi as Chairman of LKM in part because of Shi's role in the Tongfang Transaction and Shi's other fraudulent conduct that exploited LKM and harmed its shareholders, including robbing LKM of other valuable corporate assets for his own personal benefit.

111.   In addition to the above allegations of scienter, Defendants Wu and Xu's scienter is supported by the fact that they signed SOX certifications attesting to the efficacy of the Company's internal controls and the accuracy of LKM's financial statements in LKM's 2016 Annual Report.   That Defendants intentionally and/or recklessly engaged in a self-dealing transaction that divested LKM of two of its most valuable assets demonstrates that Wu and Xu were reckless in making their SOX certifications or had actual knowledge of the falsity of these statements.   Moreover, in connection with the Company's Internal Investigation, the Company admitted that its internal controls and financial reporting were ineffective and needed to be remediated.   And furthermore, in connection with the Company's notification of its delayed filing of its 2017 20-F, the Company admitted that its financial statements from the second to the fourth quarter of 2016 – and all of 2017 – were inaccurate and could not be relied upon.

### 2)   Motive And Opportunity

112.   Defendants' scienter is also supported by the fact that they had the motive and opportunity to engage in the fraud.   Indeed, leading up to 2017, Defendants had tried to sell FL Mobile at least three times to no avail.   In other words, Defendants were focused on the Tongfang Transaction and intent on divesting FL Mobile and Showself.

113.   Shi specifically was motivated to engage in the fraud.   In addition to being able to acquire corporate assets worth hundreds of millions of dollars, Shi sought to acquire these valuable assets so that he could generate the cash necessary to pay the personally-guaranteed interest on the

Convertible Note to Zhongzhi.  Moreover, in giving away the Senior Note to Zhongzhi, Shi also used the consideration from the Tongfang Transaction to avoid paying LKM on behalf of Tongfang SPC.

### G. Loss Causation

114.    In addition to the allegations herein, Defendants' fraudulent conduct directly and proximately caused Plaintiff to suffer substantial losses as a result of purchasing LKM securities at artificially inflated prices during the Relevant Period.

115.    Defendants, through their false and misleading statements and omissions, concealed the truth about the Tongfang Transaction; in reality it was a self-dealing transaction orchestrated by and for the benefit of Defendant Shi.  By concealing, among other things, that Tongfang SPC was an entity controlled by Shi and that FL Mobile and Showself would be transferred to Shi, Defendants were able to execute the sale and allow Shi to make off with the Company's valuable assets at a significant discount.

116.    However, on February 6, 2018, the false and misleading nature of Defendants' statements and omissions was revealed, causing the value of LKM securities to decline and economic harm to Plaintiff.

117.    The disclosures made in the February 2018 Report were directly related to Defendants' fraudulent scheme.  Defendants' material misstatements and omissions concealed from the market, among other things, the true and fraudulent nature of the Tongfang Transaction such that Defendants were selling the Company's valuable assets not to a legitimate and well-funded party but to the Company's own Chairman and CEO – and doing so on terms that were significantly unfavorable to the Company.

118. As a result of this negative information, the price of LKM's ADS plummeted from an opening price of $2.86 on February 6, 2018 to close that day at $1.68, a decline of 41.2 percent on heavy trading.

## H. Presumption Of Reliance And Fraud-On-The-Market Doctrine

119. During the Relevant Period, Plaintiff reasonably relied on the materially false and misleading statements and omissions alleged herein in reaching investment decisions concerning LKM securities.

120. There is a presumption of reliance established by the fraud-on-the-market doctrine because, among other things:

    a. Defendants made public misrepresentations or failed to disclose material facts during the relevant period;

    b. The misrepresentations and omissions were material;

    c. The Company's securities traded in an efficient market;

    d. The misrepresentations and omissions alleged would induce a reasonable investor to misjudge the value of the Company's securities; and

    e. Plaintiff purchased LKM securities between the time Defendants misrepresented or failed to disclose material facts, and the time the true facts were disclosed without knowledge of the misrepresented or omitted facts.

121. At all relevant times, the market for LKM's securities was efficient for the following reasons, among others:

    a. LKM's common stock met the requirements for listing, was liquid, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    b. As a regulated issuer, LKM filed periodic reports with the SEC;

    c. LKM regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and

through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.  LKM was covered by multiple analysts during the Relevant Period.

122.  As a result of the foregoing, the market for LKM's securities promptly digested current information regarding LKM from all publicly available sources and reflected such information in the price of LKM securities.  Under these circumstances, a presumption of reliance applies.

123.  Plaintiff is also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

124.  In addition, Plaintiff directly relied on Defendants' false and misleading statements alleged herein when deciding to purchase LKM securities and/or hold LKM securities.

**I.  No Safe Harbor**

125.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-

looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of LKM who knew that those statements were false when made.

### J. Plaintiff's Purchases Of LKM Securities

126.  Plaintiff purchased securities of LKM starting in 2014 and continued to purchase LKM all the way through mid-2018, before realizing the full extent of Defendants' securities fraud and other fraudulent conduct and that, as a result, the Company was going to imminently be delisted from the NYSE, leaving its shareholders with no value and little chance of recovery of the underlying assets and/or businesses.  A screenshot of Plaintiff's purchases of LKM is below:

| DATE | TRANSACTION ID | DESCRIPTION | QUANTITY | SYMBOL | PRICE | COMMISSION | AMOUNT |
|---|---|---|---|---|---|---|---|
| 8/17/2018 | 20002821084 | Bought 7823 LKM @ 1.0297 | 7823 | LKM | $1.03 | $4.95 | -$8,060.29 |
| 8/16/2018 | 19994517896 | Bought 1177 LKM @ 1.05 | 1177 | LKM | $1.05 | $4.95 | -$1,240.80 |
| 8/14/2018 | 19972580694 | Bought 5000 LKM @ 1.11 | 5000 | LKM | $1.11 | $4.95 | -$5,554.95 |
| 8/14/2018 | 19971695989 | Bought 5000 LKM @ 1.11 | 5000 | LKM | $1.11 | $4.95 | -$5,554.95 |
| 8/6/2018 | 19918392370 | Bought 5000 LKM @ 1.05 | 5000 | LKM | $1.05 | $4.95 | -$5,254.95 |
| 8/6/2018 | 19918383268 | Bought 5000 LKM @ 1.06 | 5000 | LKM | $1.06 | $4.95 | -$5,304.95 |
| 8/6/2018 | 19918291642 | Bought 5000 LKM @ 1.06 | 5000 | LKM | $1.06 | $4.95 | -$5,304.95 |
| 7/10/2018 | 19722082210 | Bought 4000 LKM @ 1.14 | 4000 | LKM | $1.14 | $4.95 | -$4,564.95 |
| 7/24/2018 | 19801350190 | Bought 16000 LKM @ 1.16 | 16000 | LKM | $1.16 | $4.95 | -$18,564.95 |
| 6/29/2018 | 19619812214 | Bought 6000 LKM @ 1.1299 | 6000 | LKM | $1.13 | $4.95 | -$6,784.35 |
| 6/29/2018 | 19619789044 | Bought 5000 LKM @ 1.1244 | 5000 | LKM | $1.12 | $4.95 | -$5,626.95 |
| 6/29/2018 | 19619795575 | Bought 5000 LKM @ 1.1288 | 5000 | LKM | $1.13 | $4.95 | -$5,648.95 |
| 1/19/2018 | 18318308348 | Bought 5000 NQ @ 3.85 | 5000 | NQ | $3.85 | $4.95 | -$19,254.95 |
| 2/10/2017 | 16358044644 | Bought 2313 NQ @ 4.2 | 2313 | NQ | $4.20 | $5.00 | -$9,719.60 |
| 2/10/2017 | 16358048219 | Bought 10374 NQ @ 4.22 | 10374 | NQ | $4.22 | $5.00 | -$43,783.28 |
| 2/10/2017 | 16357930675 | Bought 2013 NQ @ 4.2199 | 2013 | NQ | $4.22 | $5.00 | -$8,499.66 |
| 2/10/2017 | 16357930679 | Bought 300 NQ @ 4.215 | 300 | NQ | $4.22 | $0.00 | -$1,264.50 |
| 5/19/2016 | 14997989734 | Bought 10000 NQ @ 4.3 | 10000 | NQ | $4.30 | $5.00 | -$43,005.00 |
| 1/19/2016 | 14383972655 | Bought 14800 NQ @ 3.16 | 14800 | NQ | $3.16 | $5.00 | -$46,773.00 |
| 1/19/2016 | 14382804022 | Bought 20000 NQ @ 3.15 | 20000 | NQ | $3.15 | $5.00 | -$63,005.00 |
| 1/19/2016 | 14383972471 | Bought 5200 NQ @ 3.15 | 5200 | NQ | $3.15 | $5.00 | -$16,385.00 |
| 12/7/2015 | 14154424618 | Bought 376 NQ @ 3.4 | 376 | NQ | $3.40 | $5.00 | -$1,283.40 |
| 12/7/2015 | 14154424622 | Bought 100 NQ @ 3.3999 | 100 | NQ | $3.40 | $0.00 | -$339.99 |
| 12/4/2015 | 14147842183 | Bought 9524 NQ @ 3.5 | 9524 | NQ | $3.50 | $5.00 | -$33,339.00 |
| 12/4/2015 | 14147470077 | Bought 10000 NQ @ 3.5 | 10000 | NQ | $3.50 | $5.00 | -$35,005.00 |
| 9/1/2015 | 13722999039 | Bought 10000 NQ @ 3.9 | 10000 | NQ | $3.90 | $5.00 | -$39,005.00 |
| 9/1/2015 | 13723034099 | Bought 8000 NQ @ 3.9 | 8000 | NQ | $3.90 | $5.00 | -$31,205.00 |
| 9/1/2015 | 13723034105 | Bought 2000 NQ @ 3.8999 | 2000 | NQ | $3.90 | $0.00 | -$7,799.80 |
| 2/6/2015 | 12788828409 | Bought 5000 NQ @ 3.7 | 5000 | NQ | $3.70 | $5.00 | -$18,505.00 |
| 2/6/2015 | 12788831798 | Bought 5000 NQ @ 3.6899 | 5000 | NQ | $3.69 | $5.00 | -$18,454.50 |
| 1/21/2014 | 11073034620 | Bought 5000 NQ @ 12 | 5000 | NQ | $12.00 | $10.00 | -$60,010.00 |
| 1/21/2014 | 11073034618 | Bought 5000 NQ @ 12 | 5000 | NQ | $12.00 | $10.00 | -$60,010.00 |
| Total | | | 200000 | | | $154.35 | -$634,112.67 |

## V.     DEFENDANTS' MISCONDUCT OCCURING AFTER THE
##        FRAUDULENT SECURITIES TRANSACTION

127.    Incorporating the allegations set forth above regarding Plaintiff's claims under the federal securities laws (and referenced as Counts I-II below), Plaintiff also makes the following allegations in connection with Plaintiffs' common law equitable claims against Defendants.

### A.  Defendant Shi Robs LKM Of Its Senior Note

128.    After the Tongfang Transaction purportedly closed, Shi continued to loot LKM of its valuable assets, leading to the Company being delisted from NYSE in January 2019 and harming Plaintiff and the Company as a result.

129.    As alleged above, at the time the Company entered into the Tongfang Transaction, LKM owed Zhongzhi $220 million pursuant to the Convertible Note.  By the fall of 2018, LKM had paid $88 million on the note, leaving a balance of $132 million owed to Zhongzhi.  Notably, Shi had personally guaranteed the interest payable on this debt at a staggeringly high interest rate of 10 percent per year plus an additional 2.5 percent interest on the balance after the maturity date, due in October 2018.  Accordingly, by the fall of 2018, Shi was running out of time.

130.    And as alleged above, both Shi and Zhongzhi have an interest in Tongfang SPC. Accordingly, the fact that Tongfang SPC owed money to LKM under the RMB 1.77 billion Senior Note meant that both Shi and Zhongzhi actually owed LKM money.  And Given the Company's then precarious financial condition, Zhongzhi wanted to ensure that it would be able to get paid at minimum the $132 million owed to it under the Convertible Note before LKM went defunct.

131.    Shi knew this.  Shi used LKM's existing assets to get himself out of debt and pay off Zhongzhi.  In exchange for absolutely no consideration to the Company or its shareholders, Shi forced LKM to enter into the Pledge Transaction with Zhongzhi whereby LKM pledged to Zhongzhi substantially all of the Company's remaining valuable assets.  Specifically, LKM

pledged to give to Zhongzhi the Senior Note as well as LKM's shares of NQ International Inc. ("NQ International"), a LKM subsidiary which holds nearly every other revenue-generating Company subsidiary ("Pledge Transaction"). In other words, Shi bribed Zhongzhi; in effect, he gave Zhongzhi the overwhelming bulk of the Company's assets in exchange for Zhongzhi's not calling in the Convertible Note – even though Zhongzhi did not formally agree to extend the Convertible Note's maturity date to the benefit of LKM. Accordingly, Shi accomplished two things with this deal: by exploiting LKM, he got himself off the hook for the interest on the $132 million debt, and, because of his and Zhongzhi's interest in Tongfang SPC, he freed both himself and Zhongzhi of having to pay LKM under the Senior Note.

**B. Defendant Shi Orchestrates China AI's Purchase Of Class B Shares**

132.    By the summer of 2018, Shi was under pressure, as LKM's internal investigation concerning his forced resignations of Li was nearing a result. Accordingly, Shi knew that his imminent removal from the Company and its board of directors was possible.

133.    To secure his control of LKM's board of directors, Shi took action. And like the Tongfang Transaction, he did so using a vehicle secretly owned and/or controlled by him. Specifically, in a press release dated July 19, 2018, LKM announced that China AI Capital Limited ("China AI") had agreed to pay LKM $20 million to acquire over 70,000,000 Class B shares of LKM (the "Class B Shares Transaction"). This transaction was effectuated, and China AI came into possession of these shares. Based on LKM's current shareholder registry, China AI still retains its 70,175,439 Class B shares.

134.    However, over two years after the Class B Shares Transaction, China AI has paid at most only half of what it owes to LKM for these shares. Importantly, Class B shares confer

38

significant voting power; each Class B share holds ten times the voting power of a Class A common share of LKM.

135.    As a result of the Class B Shares Transaction, China AI was able to place its two principals, Yu "Bruson" Li ("Li") and "Larry" Chi ("Chi"), on LKM's Board of Directors, gaining significant control of the Board as a result.

136.    LKM hid the Class B Shares Transaction from its counsel at the time, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps"), and, when Skadden Arps learned of the Class B Shares Transaction, the firm expressed that the Class B Shares Transaction had no legitimate purpose.

137.    The purpose of the Class B Shares Transaction was to install Shi's proxies, Li and Chi, on LKM's board of directors and thereby allow Shi to retain control of LKM in the event of his ouster.  Accordingly, like Tongfang SPC, Shi used China AI as a vehicle to accomplish his personal goals.

138.    Indeed, China AI, like Tongfang SPC, is an entity owned by or controlled by Shi. For example, Li and Chi have long-standing relationships with Shi.  Li, who held 50% of the shares of China AI at the time of the Class B Shares Transaction and subsequently became its sole shareholder, was Vice Chairman of LKM from 2010 to 2015 – while Shi was its CEO and Chairman.  Moreover, prior to the Class B Shares Transaction, Shi had invested in HH-Medic, Inc. ("HH Medic"), a Cayman Island company operating in Beijing and founded by Li, using LKM funds.  LKM currently owns over 11 percent of HH-Medic's shares.  A portion of the funds paid to LKM in connection with the Class B Shares transaction was paid for by HH Medic.

139.    Critically, to date, China AI has never paid in full for its Class B shares.  Indeed, $10 million of the $20 million remain outstanding according to LKM's Shareholder Registry.

Accordingly, China AI, and through China AI Shi, is attempting to exert control of the Company to the detriment of the Company.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act And Rule 10b-5
### (Against All Defendants)

140.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.

141.    During the Relevant Period, Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

142.    Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, in that they:

    a.    Employed devices, schemes, and artifices to defraud;

    b.    Made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c.    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of LKM securities during the relevant period.

143.    Plaintiff has suffered damages in that, relying directly or indirectly upon the materially false and misleading statements made by Defendants, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public

statements by Defendants, Plaintiff paid artificially inflated prices for LKM securities.  Plaintiff

would not have purchased LKM securities at the prices paid, or at all, if Plaintiff had been aware

that the market prices of those securities had been artificially and falsely inflated by Defendants'

misleading statements.

144.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered

damages in connection with his purchases of LKM securities during the Relevant Period.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

145.     Plaintiff repeats and realleges each and every paragraph contained above as if set

forth herein.

146.     During the Relevant Period, the Individual Defendants acted as controlling persons

of LKM within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

147.     Each of the Individual Defendants was a controlling person of LKM within the

meaning of Section 20(a) of the Exchange Act.

148.     By virtue of their positions and their power to control public statements about

LKM, the Individual Defendants had the power and ability to influence and control the actions of

LKM and its employees, and did in fact influence and control, directly or indirectly, the decision-

making of the Company.

149.     The Individual Defendants culpably participated in LKM's violations of Section

10(b) and Rule 10b-5 with respect to the Count I, referenced above.

150.     By reason of such conduct, the Individual Defendants are liable pursuant to Section

20(a) of the Exchange Act.

## COUNT III
### Maintaining Or Re-Appointing The Receiver

151.     Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.

152.     Plaintiff alleges this claim for relief in equity as provided for in the Exchange Act and separately in connection with Plaintiff's equitable claims.

153.     On February 1, 2019, the Court appointed Robert W. Seiden as the Receiver in this action ("Receiver Order").

154.     For all the reasons set forth in the Receiver Order, the Court should issue an order maintaining the appointment of the Receiver or allow the Receiver to continue overseeing, monitoring, and lawfully controlling LKM until such time as the Court deems the Receivership to be no longer necessary.

155.     Moreover, due to the wrongful conduct herein, which includes, *inter alia*, Defendants' theft of LKM assets, engaging in self-dealing fraudulent transactions that exploited LKM and harmed LKM's shareholders, abandonment of business lines and operations, and failure to properly manage the Company in material ways, the Receiver is necessary to: (i) prevent the further dissipation of the Company and its assets; (ii) take the necessary steps in China to claw back the assets that were wrongfully transferred out of the ownership of the Company; and (iii) manage the Company's operations and restore value to the Company and its shareholders.

## COUNT IV
### Unjust Enrichment
### (Against Shi)

156.     Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.

157.     By his wrongful acts and omissions, Shi has been and continues to be unjustly enriched at the expense of and to the detriment of Plaintiff and LKM, and the circumstances require relief in equity and good conscious.

158.     Shi has gained the benefit of ownership of certain assets belonging to LKM at the expense of LKM losing said assets.

159.     Because Shi has gained this benefit at the expense of LKM, equity and good conscious requires that Defendant and/or LKM be afforded restitution.

**COUNT V**
**Common Law Fraud**
**(Against All Defendants)**

160.     Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.

161.     Plaintiff brings this claim directly against all Defendants.

162.     Defendants made material misrepresentations of material fact and/or omitted material facts as set forth above.

163.     These misrepresentations and/or omissions were made intentionally, or at a minimum, recklessly, to induce reliance by Plaintiff when making decisions to invest in LKM securities.

164.     These misrepresentations and/or omissions constitute fraud and deceit under the common law.

**COUNT VI**
**Negligent Misrepresentation**
**(Against All Defendants)**

165.     Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.

166.    Plaintiff brings this claim directly against all Defendants.

167.    As to this Cause of Action, Plaintiff expressly disclaims any allegation of fraud or intentional misconduct.

168.    Defendants authorized or caused the representations and/or omissions set forth above.

169.    Defendants supplied false information for use by Plaintiff in making an investment decision.

170.    Defendants made misrepresentations that they knew, or should have known, to be false in order to induce Plaintiff to purchase LKM securities.

171.    Defendants breached their duty to exercise reasonable care in making these misrepresentations to Plaintiff.

172.    Moreover, Defendants had a duty to disclose certain information to Plaintiff, as alleged above. Defendants breached that duty by failing to disclose such information.

173.    Plaintiff reasonably relied on the information Defendants provided and were damaged as a result of these misrepresentations and omissions.

174.    Plaintiff would not have purchased LKM securities at all, or at the inflated prices they paid, had they known the true facts.

175.    By reason of the foregoing, Defendants are liable to Plaintiff for negligent misrepresentation.

176.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff has suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief and judgment as follow:

(a) Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b) Awarding punitive damages against Defendants;

(c) Appointing or maintaining the appointment of the Receiver to assume or continue to assume full control over the Company, its assets, and its employees;

(d) Awarding Plaintiff his reasonable costs and expenses incurred in this action; and

(e) Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated: October 5, 2020
New York, New York

SEIDEN LAW GROUP LLP

/s/ Jake Nachmani
Jake Nachmani
469 Seventh Avenue
Fifth Floor
New York, NY 10018
jnachmani@seidenlegal.com
(646) 766-1723

*Counsel for Plaintiff Baliga*

## CERTIFICATE OF SERVICE

I hereby certify that on this day I caused a true and correct copy of the foregoing to be filed using the Court's Electronic Filing System ("ECF System"). The document is available for viewing and downloading via the ECF System and will be served by operation of the ECF System upon all counsels of record.

Dated: October 5, 2020                                    SEIDEN LAW GROUP LLP


                                                          /s/ Jake Nachmani
                                                              Jake Nachmani